**Fred T. CALDWELL, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 57, 2000.

Supreme Court of Delaware.

Submitted: June 29, 2001.
Decided: Sept. 13, 2001.

Thomas A. Pedersen, Esquire, Wilmington, Delaware, for Appellant.

John Williams, Esquire, Deputy Attorney General of the Department of Justice, Dover, Delaware, for the State.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices, constituting the Court en Banc.

VEASEY, Chief Justice.

In this appeal, we address the constitutional limitations on searches and seizures conducted during the course of a traffic stop. It has long been clear that the duration and execution of a traffic stop, like any investigative stop, must be reasonably related to the initial purpose of the stop. Thus, under the Fourth Amendment to the United States Constitution, any detention of a vehicle or its occupants beyond that required to complete the purpose of the traffic stop must be supported by independent facts sufficient to justify the additional intrusion. Because the defendant in this case was detained without sufficient justification for purposes unrelated to the traffic stop, we conclude that the Superior Court erred in denying the defendant's motion to suppress the evidence discovered as the product of the illegal detention. We therefore reverse the judgment of the Superior Court and remand the case for proceedings consistent with this Opinion.

### Facts

On the evening of July 10, 1998, Officer Nicolas Berna observed Fred Caldwell and a passenger, later identified as Isaac Wiley, parked in front of a yellow curb at the corner of Division and South New Streets in Dover, Delaware.[1] The yellow curb signifies a fire lane in which parking is prohibited under 21 Del. C. § 7001. The officer recognized Caldwell as a person suspected of involvement in drug dealing and decided to stop Caldwell for the parking violation. The officer acknowledges that this decision was based, in part, on Caldwell's criminal history and unspecified "intelligence that [the officer] had gathered" in connection with an ongoing drug investigation.[2] When Caldwell saw the of-

---

1. In his testimony at the suppression hearing, Officer Berna repeated the familiar mantra that the corner is "a high drug area." The officer did not present support for this assertion at the hearing.

2. Indeed, the bulk of the affidavits submitted in support of a request for a search warrant after Caldwell's arrest had been prepared over the course of an extensive investigation into the activities of Caldwell's family. Nevertheless, Officer Berna conceded that he had no information that either Caldwell or Wiley

ficer drive by, he pulled away from the curb, traveling in the same direction as Officer Berna's car. Officer Berna pulled over to allow Caldwell to pass him and he then proceeded to follow Caldwell's car.

After following the car for a short time, the officer activated his emergency lights. The officer testified that, as Caldwell pulled over, the officer noticed Caldwell "look at me in his rear view mirror and I could see him doing something on the side" with his hand. The officer immediately called for back-up. The officer testified at the suppression hearing that Caldwell appeared "extremely nervous," was perspiring and his hands were shaking.[3] The officer asked Caldwell for his credentials, and Caldwell produced his license and registration. The officer then asked Caldwell to exit the vehicle because he "didn't like the way he was acting, kind of looking around, still nervous."

The officer then inquired about the identity of the passenger in Caldwell's car, asking where Caldwell had picked him up and where they were going. Caldwell responded that he did not know the name of his passenger, but that he had picked the passenger up on South Queen Street and they were going to Capitol Park. The officer immediately frisked and handcuffed both Caldwell and the passenger, Isaac Wiley, and waited until the requested back-up unit arrived on the scene.

When another officer arrived, he and Officer Berna questioned Wiley about how he met Caldwell and where they were going. Wiley responded that he had been with Caldwell all day and that they were going to Bay Court Plaza. Officer Berna then asked Caldwell what he was doing with his right hand as he was pulling over. According to the officer, Caldwell answered that he was putting a razor blade in the center console of the car and invited the officer to look for himself.[4]

When he was unable to find the razor blade in the console, the officer proceeded to use a drug-detecting dog to identify any contraband that may have been in Caldwell's car. The dog alerted to the center console of the car, and a further search by the officer revealed a scale, a razor blade, and plastic bags containing crack and powder cocaine concealed underneath the outer shell of the center console. The officers then arrested both Caldwell and Wiley and took them to the police station.

During an interview at the station house, Wiley told the police that the cocaine in the car belonged to Caldwell and that Caldwell kept more cocaine in a house-trailer located just south of Dover. Based on this information, the State Police obtained a nighttime search warrant for the trailer and executed the warrant at about 2:10 a.m. on July 11, 1998. Upon entering the trailer, the police found Patrick Caldwell, the Defendant's uncle, in the process of flushing a large amount of cocaine down a toilet. Catherine Caldwell, the Defendant's mother, was also in the

was involved in criminal activity that day and that "I usually don't take enforcement action" or give tickets for parking violations.

3. According to the officer, when he asked Caldwell why he was so nervous, "[h]e said because I was a cop." On cross-examination, the officer conceded that "people get nervous when they are stopped by police officers" and that "people perspire in the middle of July."

4. The officer testified that Caldwell several times gave his permission to search the car and encouraged the officer to look in the trunk of the car. In his testimony at the suppression hearing, Caldwell contested the officer's account and asserted that he did not consent to the officer's search of his car. The Superior Court did not address the State's consent rationale for the search, and therefore did not resolve this conflict in the suppression hearing testimony.

trailer at the time. The ensuing search turned up over $15,000 in cash and 723 grams of crack cocaine.

The police arrested Patrick and Catherine and transported them to the police station. During interviews with the police, both indicated that the cocaine found in the trailer belonged to Caldwell. They also told the police that Caldwell occupied the room in the trailer in which the cocaine was stored and that Caldwell supplied them with cocaine for resale.[5]

The State charged Caldwell with trafficking in cocaine, possession with intent to deliver cocaine, and various other offenses.[6] Before trial, Caldwell filed a motion to sever the charges relating to the cocaine found in his car from the charges relating to the cocaine found in the trailer. Caldwell also filed several motions to suppress the evidence obtained as a result of the warrantless search of his car and the nighttime search of the trailer. The Superior Court denied Caldwell's motion to sever.[7] After conducting a suppression hearing, the Court denied Caldwell's motions to suppress.[8] On December 12, 1999, a jury convicted Caldwell on all charges except one count of maintaining a dwelling for keeping controlled substances. The trial court sentenced Caldwell to twenty-eight years in prison followed by probation.

■ On appeal, Caldwell challenges the judgment of the Superior Court on six grounds. First, he argues that the initial traffic stop was unreasonable, and thus violated article I, section 6 of the Delaware Constitution[9] because the officer used Caldwell's traffic violation as a pretext to initiate a baseless drug investigation. Second, Caldwell contends that, even if the initial stop was valid, the officer's conduct during the stop was not reasonably related to the justification for the traffic stop and therefore violated his constitutional rights.[10] Third, he argues that the application for the nighttime warrant to search the trailer did not satisfy the requirements of 11 *Del. C.* § 2308. Fourth, he maintains that the Superior Court abused its discretion by denying his motion to sever the charges stemming from the cocaine found

---

**5.** Carlton Bowers, Jr. similarly testified at trial that he had seen Caldwell purchase three kilograms of cocaine in New York and he had seen Caldwell "cooking" and weighing cocaine in the trailer several days before Caldwell's arrest.

**6.** Caldwell was also indicted for maintaining a vehicle for keeping controlled substances, 16 *Del. C.* § 4755(a)(5), maintaining a dwelling for keeping controlled substances, *id.*, second-degree conspiracy, 11 *Del. C.* § 512(2), and possession of drug paraphernalia, 16 *Del. C.* § 4771.

**7.** *State v. Caldwell,* Del.Super., Cr.A.Nos. IK98–07–0540, 0541, 0543, and 0545 through 0549, 1999 WL 743556 (July 7, 1999) (ORDER) (denying severance motion).

**8.** *See State v. Caldwell,* Del.Super., Cr.A.Nos. IK98–07–0540, 0541, 0543, and 0545 through 0549, 1999 WL 1240828 (Oct. 22, 1999) (ORDER) (denying motion to suppress).

**9.** Caldwell's claim on the pretexual stop is necessarily confined to the Delaware Constitution because any federal constitutional claim on this issue has been foreclosed by the United States Supreme Court. Addressing the permissible justification for a traffic stop under the Fourth Amendment to the federal constitution, the Supreme Court in *Whren v. United States,* 517 U.S. 806, 813–14, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), held that a traffic stop is reasonable so long as the officer has probable cause to believe that the driver has violated a traffic law—even if the officer decided to stop the car because the officer subjectively intended to use the stop as a means to investigate unrelated criminal activity. We do not address the Delaware constitutional claim because of our decision on the fourth amendment claim.

**10.** Caldwell's brief is vague on this issue, but we construe his claim as raising federal constitutional violations. *See* note 15, *infra.*

in his car from the charges stemming from the cocaine found in the trailer. Fifth, he contends that the trial court's failure to record seven sidebar conferences prejudiced his ability to prosecute his appeal. Finally, Caldwell challenges the Superior Court's decision to deny his motion for a mistrial when it was discovered that one of the jurors was a close friend of the wife of a lawyer in the Attorney General's office.

### Limitations on the Scope of a Valid Traffic Stop Under the Federal Constitution

Caldwell argues that the officer's conduct during the traffic stop was not justified under the Fourth Amendment to the federal constitution. In particular, Caldwell argues that the officer frisked and handcuffed him without sufficient justification and thus exceeded the permissible scope of a traffic stop. The State responds that the officer's decision to handcuff and frisk Caldwell was supported by the officer's observations of Caldwell and the officer's safety concerns.

■ The Superior Court held that the officer had probable cause to conduct a warrantless search of Caldwell's car,[11] including the use of the drug-detecting dog, based on: (1) conflicting statements by Caldwell and the passenger, (2) Caldwell's assertion that he did not know the name of his passenger, (3) the officer's inability to locate the razor blade that Caldwell allegedly placed in the center console, and (4) Caldwell's nervous behavior.[12]

■ In reaching this conclusion, the Superior Court addressed only the search that uncovered the cocaine hidden in the center console and failed to consider the prior question whether the officer had a sufficient justification to pat-down and handcuff Caldwell during the detention leading to that search.[13] We review de novo claims that the trial court erred in formulating the law or in applying the applicable legal standard to undisputed facts in deciding a motion to suppress evidence.[14]

### A. Constitutional Limits on the Scope of a Traffic Stop

■ Under the Fourth Amendment, a traffic stop is a seizure of a vehicle and its occupants by the State. A stop is subject

11. The police may conduct a warrantless search of an automobile if they have probable cause to believe that the vehicle contains evidence of criminal activity. *See Tatman v. State*, Del.Supr., 494 A.2d 1249, 1251 (1985) ("So long as the police have probable cause to believe that an automobile is carrying contraband or evidence, they may lawfully search the vehicle without a warrant.") (citing *Carroll v. United States*, 267 U.S. 132, 153–54, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). Probable cause is measured according to the "totality of the circumstances" known to the officer at the time of the search. *Hovington v. State*, Del.Supr., 616 A.2d 829, 833 (1992) (quoting *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

12. *See State v. Caldwell*, Del.Super., Cr.A.Nos. IK98–07–0540, 0541, 0543, and 0545 through 0549, 1999 WL 1240828 (Oct. 22, 1999) (ORDER), Order at ¶ 11.

13. As we discuss in more detail below, when the officer handcuffed Caldwell, the officer had not yet (1) elicited conflicting answers from Wiley about their destination and relationship, (2) asked Caldwell why he moved his right arm while pulling over, or (3) searched the center console to verify Caldwell's explanation for the movement.

14. *See Ornelas v. U.S.*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ("We think independent appellate review of these ultimate determinations of reasonable suspicion and probable cause is consistent with the position we have taken in past cases."); *see also Jones v. State*, Del.Supr., 745 A.2d 856, 860 (1999).

to constitutional limitations.[15] Specifically, the State must demonstrate that the stop and any subsequent police investigation were reasonable in the circumstances. First, the stop must be justified at its inception by reasonable suspicion of criminal activity as defined in *Terry v. Ohio.*[16]

Second, "the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'"[17] The question we address here is whether the officer's conduct during the traffic stop was sufficiently related to the parking violation.[18]

15. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 880–81, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In *Brignoni–Ponce*, a border patrol car stopped a vehicle near the Mexican border to question the vehicle's occupants about their citizenship and immigration status. *See also Whren*, 517 U.S. at 809–10, 116 S.Ct. 1769 ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."). Because we have concluded that the officer exceeded the proper scope of a traffic stop under the federal constitution, it is unnecessary to address Caldwell's arguments on this point under article I, section 6 of the Delaware Constitution.

16. *See Brignoni–Ponce*, 422 U.S. at 880–81, 95 S.Ct. 2574 (citing *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.")).

17. *Brignoni–Ponce*, 422 U.S. at 880–81, 95 S.Ct. 2574 (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. 1868); *see also Robertson v. State*, Del. Supr., 596 A.2d 1345, 1351 (1991) ("[If the initial stop is justified,] [t]he question then becomes whether the further 'stop' or detainment after defendant's vague answer to the question concerning ownership of the car was supported by reasonable and articulable suspicion."); *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[R]easonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop."); *id.* at 500, 103 S.Ct. 1319 ("The scope of the detention must be carefully tailored to its underlying justification.... [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to

verify or dispel the officer's suspicion in a short period of time.").

18. This Court's decision in *Webb v. State*, Del. Supr., 708 A.2d 631 (1998) (ORDER), applied the Supreme Court's Fourth Amendment analysis in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), but it did not address the defendant's rights under the Delaware Constitution. Because we conclude that the officer's conduct in this case exceeded the scope of the traffic stop and was not supported by facts uncovered during the stop, the defendant's federal constitutional rights were violated. Thus, there is no need to reach the issue of first impression raised by Caldwell concerning the reasonableness of the initial traffic stop under article I, section 6 of the Delaware Constitution. Relying on a variety of cases decided in other states, Caldwell argues that the traffic stop was unreasonable because the officer subjectively intended to use the stop as a pretext to investigate Caldwell's activities rather than to enforce traffic laws. *See, e.g., State v. Ladson*, 138 Wash.2d 343, 979 P.2d 833, 837 (1999) ("Article I, section 7 [of the Washington state constitution], forbids use of pretext as a justification for a warrantless search or seizure because our constitution requires [that] we look beyond the formal justification for the stop to the actual one. In the case of pretext, the actual reason for the stop is inherently unreasonable, otherwise the use of pretext would be unnecessary."); *see also State v. Sullivan*, Ark.Supr., 16 S.W.3d 551, 553 (2000) ("We draw a clear distinction between arresting a person with crack cocaine in his hands as was the case in *Whren* and effecting a pretextual arrest for purposes of a search, such as we have in the instant case. Surely that flies in the face of reasonableness, which is the essence of the Fourth Amendment."); *State v. Varnado*, Minn.Supr., 582 N.W.2d 886, 892 (1998) ("For intrusions that are not based on probable cause, such as the frisk here, we have held that the pretext factor is relevant to determining whether the

■■■ The duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop.[19] As the Maryland Court of Appeals has held, any investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by

independent facts sufficient to justify the additional intrusion.[20] Once the officer has issued a citation or warning and has run routine computer checks, the vehicle must be released unless the driver voluntarily consents to further questioning or the officer uncovers facts that independently warrant additional investigation.[21] In short,

---

intrusion is reasonable."); *State v. Haskell*, Me.Supr., 645 A.2d 619, 621 (1994) (adopting the "reasonable officer test," later rejected by the *Whren* Court, under which the trial court determines "whether a reasonable officer would have made the stop absent the invalid purpose").

19. *See Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[R]easonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop."); *id.* at 500, 103 S.Ct. 1319 ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."); *Hicks v. State*, Del.Supr., 631 A.2d 6, 10 (1993) ("[A] search which is *minimally intrusive* and reasonably related in scope to the circumstances which justified the interference passes constitutional muster.") (emphasis added and citations omitted); *see also* 11 *Del. C.* § 1902 (authorizing brief investigative stops where an officer has a reasonable ground to believe that the suspect has committed a crime).

20. *See Ferris v. State*, 355 Md. 356, 735 A.2d 491, 499 (1999) ("[T]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention."); *see also Whitehead v. State*, 116 Md.App. 497, 698 A.2d 1115, 1118 (1997) ("[T]he purpose of the traffic stop is to issue a citation or warning. Once that purpose has been satisfied, the continued detention of a vehicle and its occupant(s) constitutes a second stop, and must be independently justified by reasonable suspicion.") (citation omitted); *People v. Redinger*, Colo.Supr., 906 P.2d 81, 85–86 (1995) ("When, as here, the purpose for which the investigatory stop was instituted has been accomplished and no other reasonable suspi-

cion exists to support further investigation, there is no justification for continued detention and interrogation of citizens."); *Com. v. Torres*, 424 Mass. 153, 674 N.E.2d 638, 642 (1997) ("It is well settled that a police inquiry in a routine traffic stop must end on the production of a valid license and registration unless the police have grounds for inferring that 'either the operator or his passengers were involved in the commission of a crime ... or engaged in other suspicious conduct.'").

21. *See Ferris*, 735 A.2d at 499 ("[O]nce the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot."); *United States v. Mendez*, 10th Cir., 118 F.3d 1426, 1429–30 (1997) (holding that, after the traffic stop is complete, "[f]urther questioning is permissible only if (1) 'the encounter between the officer and the driver ceases to be a detention, but becomes consensual, and the driver voluntarily consents to additional questioning,' or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity.") (internal citations omitted); *People v. Rodriguez*, Colo.Supr., 945 P.2d 1351, 1360 (1997) (same); *United States v. Griffin*, 11th Cir., 109 F.3d 706, 708 (1997) ("[O]nce an officer has briefly stopped a motor vehicle operator for the purpose of issuing a traffic violation (i.e., a ticket), the officer's continuing detention of the vehicle's occupants is authorized under the Fourth Amendment only if the officer can point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'") (citing *United States v. Tapia*, 11th Cir., 912 F.2d 1367, 1370 (1990)).

an officer's observation of a traffic violation "does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth Amendment rights...." [22]

 Even where the traffic stop is not formally terminated by the issuance of a citation or warning, "the legitimating *raison d'etre* [of the stop may] evaporate if its pursuit is unreasonably attenuated or

allowed to lapse into a state of suspended animation." [23] Whether a given detention is "unreasonably attenuated" necessarily involves a fact-intensive inquiry in each case. [24] This standard respects the State's interest in investigating suspicious conduct during a valid traffic stop, while restricting police officers' authority to employ marginally applicable traffic laws as a device to circumvent constitutional search and seizure requirements. [25]

---

**22.** *Charity v. State,* 132 Md.App. 598, 753 A.2d 556, 572 (2000).

**23.** *Id.* at 565; *see also Pryor v. State,* 122 Md.App. 671, 716 A.2d 338, 340 (1998) ("We hold that, unless continued detention can be justified by what occurs during the brief period of time it takes to determine whether the motorist has a valid license and whether the vehicle has been reported stolen, a motorist who *is subjected to a* 'Whren stop' *for a minor traffic violation cannot be detained at the scene of the stop longer than it takes—or reasonably should take—to issue a citation for the traffic violation that the motorist committed.").

**24.** For example, the diligence of the officer in completing the initial purpose of the traffic stop is one factor to be considered in assessing the reasonableness of the duration of the stop. *See id.* As the court in *Charity* observed, "an initially valid traffic stop could not serve as the justifying predicate for the narcotics-related investigation that followed in its immediate wake, notwithstanding the fact that ... 'the total length of the stop was brief and did not exceed the normal duration for a traffic stop.' " *Charity,* 753 A.2d at 566 (quoting *Munafo v. State,* 105 Md.App. 662, 660 A.2d 1068 (1998)).

**25.** The latter concern has particular force where the additional detention is "for the purpose of determining whether the trooper could acquire sufficient probable cause or a waiver that would permit him to search the car for illegal narcotic." *Whitehead,* 698 A.2d at 1120; *see also Charity,* 753 A.2d at 565 ("[T]he purpose of the justifying traffic stop may not be conveniently or cynically forgotten and not taken up again until after an intervening narcotics investigation has been

completed or has run a substantial course."). This tactic is, in essence, a "fishing expedition" for probable cause or consent to search. *Ohio v. Robinette,* 519 U.S. 33, 41, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (Ginsburg, J., concurring) (" 'While the legality of consensual encounters between police and citizens should be preserved, we do not believe that this legality should be used by police officers to turn a routine traffic stop into a fishing expedition for unrelated criminal activity.' ") (quoting *State v. Robinette,* 73 Ohio St.3d 650, 653 N.E.2d 695, 698–699 (1995), *rev'd* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). The Maryland Court of Special Appeals summed up the problem:

> Driving is amongst the most heavily regulated activities in today's society. Besides the obvious moving violations such as speeding and running red lights, state traffic codes also comprise a myriad of other offenses, many of which are minute and insignificant. For instance, state traffic codes include provisions on safety inspections, pollution control, vehicle noise, tire tread, lights, and countless others. In fact, studies conducted on a stretch of Interstate 95 between Baltimore and Delaware revealed that 93% of all drivers committed some type of traffic violation. In light of the broad and extensive nature of state traffic codes, the police essentially have unlimited discretion to stop any driver, for any reason. Since every driver on the roadways will eventually violate some trivial regulation at the very least, police officers can theoretically stop any motorist they wish.

*Whitehead,* 698 A.2d at 1120 n. 4 (citing David A. Harris, *Whren v. United States: Pretextual Traffic Stops and 'Driving While Black,'* The Champion, March 1997, at 41).

These limitations on police authority are consistent with the Supreme Court's holding in *Whren v. United States* because the Court did not address the permissible scope of a police investigation after a pretextual stop under the Fourth Amendment.[26] In *Whren*, plain-clothes officers stopped the defendant for turning without signaling and for driving at an unreasonable speed. As the officers approached the vehicle, they saw the defendant holding bags of crack cocaine in plain view. The *Whren* Court therefore was not confronted with a situation in which the police prolonged a traffic stop or used the stop as a springboard for a full investigative detention or search.

 In the present case, after stopping Caldwell's car and requesting his credentials, Officer Berna immediately asked Caldwell to exit the car.[27] He then asked Caldwell who his passenger was, where they were coming from, and their ultimate destination. Under 11 *Del. C.* § 1902, the officer had the authority to question Caldwell about his "name, address, business abroad, and destination" because the officer had "reasonable ground to suspect" [28] that Caldwell, as the driver of the car, had violated a parking statute.[29] But, rather than continue to question the occupants of the car, the officer frisked and handcuffed Caldwell and detained him until another officer arrived. Because these actions were entirely unrelated to the parking violation and exceeded the proper scope of a traffic stop for a parking violation, it was at this point that the traffic stop ended and a second, independent investigative detention began.[30]

**26.** *See Whren*, 517 U.S. at 813–14, 116 S.Ct. 1769.

**27.** Under the Fourth Amendment, an officer may order both the driver and the passengers to exit the car during the course of a valid traffic stop. *See Maryland v. Wilson*, 519 U.S. 408, 412–14, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (citing *Mimms*, 434 U.S. at 109–111, 98 S.Ct. 330). *But see Charity*, A.2d at 567 ("Sergeant Lewis's ordering of the appellant out of the car was not, even in part, an incident of the traffic stop. It was, in our judgment, exclusively for the independent purpose of investigating a likely narcotics violation.").

**28.** We have interpreted the term "reasonable ground to suspect" to mean "reasonable suspicion," in accordance with the United States Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Byrd v. State*, Del.Supr., 458 A.2d 23, 25 (1983).

**29.** *See Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information

confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.").

**30.** *Cf. United States v. Lambert*, 10th Cir., 46 F.3d 1064, 1068 (1995) "[W]hat began as a consensual encounter quickly became an investigative detention once the agents received [the defendant's] driver's license and did not return it to him."); *Charity*, 753 A.2d at 567 ("As soon as Sergeant Lewis smelled and saw the air fresheners, if not before, he was, figuratively as well as literally, 'on the scent' of a narcotics violation. His total focus had shifted from the traffic infraction, if it had ever been there, to drug interdiction. . . . It is clear that Sergeant Lewis's ordering of the appellant out of the car so that he might be subjected to further questioning at the rear of the car had no conceivable relationship to the purpose of the traffic stop."), *cert. denied*, 360 Md. 487, 759 A.2d 231 (2000); *Munafo v. State*, 105 Md.App. 662, 660 A.2d 1068, 1073 (1995) ("Deputy Houck did not actually issue a citation or warning after receiving word that Munafo's license and rental agreement were valid. Rather, he waited for Sergeant Elliott to arrive on the scene before approaching appellant a second time.").

## B. Review of Independent Justification for Continued Detention

 The question thus becomes whether the continuation of Caldwell's detention, including the pat-down search and the use of handcuffs, was supported by independent facts, known to the officer at the time, that justify the additional intrusion.[31] When Officer Berna frisked and handcuffed Caldwell, the officer had observed three relevant facts: (1) Caldwell's movement of his right arm as he pulled over, (2) Caldwell's apparent nervousness and perspiration, and (3) Caldwell's implausible assertion that he did not know the identity of his passenger.

 A suspect's nervous behavior and odd assertion that he did not know the name of his passenger may or may not, in some situations, provide the officer with reasonable suspicion justifying further limited questioning of the suspect and his passenger.[32] But these facts, standing alone, cannot in this case justify the detention of extended duration and the more intrusive measures like the pat-down search and the officer's use of handcuffs.[33]

---

31. See Robertson, 596 A.2d at 1351.

32. Most courts require something more than nervousness and implausible or conflicting answers to support a finding of reasonable suspicion—for example, insufficient documentation or the odor of masking agents. See, e.g., People v. Banks, 85 N.Y.2d 558, 626 N.Y.S.2d 986, 650 N.E.2d 833, 835 (1995) ("[D]efendant's nervousness and the innocuous discrepancies in his and Jones' answers to the Trooper's questions regarding the origin, destination and timing of their trip did not alone, as a matter of law, provide a basis for reasonable suspicion of criminality."); United States v. Dortch, 5th Cir., 199 F.3d 193, 199 (1999) (finding no reasonable suspicion of drug activity based on nervousness and conflicting answers); cf. United States v. Martinez, 8th Cir., 168 F.3d 1043, 1047 (1999) (finding reasonable suspicion where defendant was nervous, occupants of the car gave police inconsistent answers, driver produced an incomplete bill of sale instead of registration, and a computer check indicated criminal history); United States v. Palomino, 6th Cir., 100 F.3d 446, 450 (1996) (finding reasonable suspicion based on occupants' inconsistent stories about the ownership of the car and the purpose of the trip, nervousness of the occupants, the driver's criminal record, and the odor of chemicals associated with cocaine).

Other courts have found nervousness and conflicting stories sufficient to support reasonable suspicion. See, e.g., United States v. Springer, 2nd Cir., 946 F.2d 1012, 1017 (1991) ("Springer's 'confused and contradictory responses' during the initial interview with [the officers], together with his implausi-

ble claim that the suitcase did not belong to him provided reasonable suspicion to detain him by the time that interview was concluded.") (internal citations omitted); United States v. Hardy, 11th Cir., 855 F.2d 753, 758 (1988) (finding reasonable suspicion based on conflicting stories and the fact that occupants who claimed to be friends on a fishing trip did not know each others' last names or other basic information); United States v. Kopp, 10th Cir., 45 F.3d 1450, 1453–54 (1995) (finding reasonable suspicion based on implausible explanation for trip, the occupants' inconsistent stories, and the nervousness of the driver).

33. Under 11 Del. C. § 1904(a)(1) and 21 Del. C. § 701(a)(1), officers are permitted to make a warrantless arrest for "violations of this title committed in their presence." In the present case, the officer observed Caldwell violate 21 Del. C. § 7001 prohibiting "stopping, standing or parking in fire lanes." Although the officer here arguably employed "means that approach the conditions of arrest," Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (citing Dunaway v. New York, 442 U.S. 200, 211–12, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)), there is no need to determine whether the officer's conduct here constitutes a warrantless arrest within the meaning of 11 Del. C. § 1904. See also 11 Del. C. § 1901(1) (defining arrest). Officers have the authority to make warrantless arrests for traffic violations under both Delaware statutory law and the Fourth Amendment, see Atwater v. City of Lago Vista, 532 U.S. 318, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549 (2001) ("If an officer has probable cause to believe that an

In the circumstances of this case, we conclude that the duration and intrusiveness of the traffic stop were not reasonably related to the justification for the stop (i.e., the parking violation) and were not supported by independent facts justifying the officer's conduct.

The State also suggests that it was necessary to pat-down and handcuff Caldwell for the officer's safety. After an officer effectuates a lawful investigative stop supported by reasonable suspicion,[34] the officer has "an absolute right" to conduct a limited search of the suspect for dangerous weapons *if* "the officer has a reasonable belief that the detainee is presently armed and dangerous."[35] As we observed in *Jones v. State*, however, " 'while officer safety is both legitimate and weighty, it cannot in all circumstances justify a search or seizure. Otherwise nearly any invasion of a person's privacy could be justified by arguing that the po-

lice needed to protect themselves from harm.' "[36]

In this case, Officer Berna had no information that Caldwell was in possession of drugs at the time of the stop, and the officer did not indicate that he had any reason to fear for his safety or to believe that Caldwell posed a threat to the officer or to others. Because there are no facts that would justify a reasonably prudent person in believing that Caldwell was armed and dangerous, the use of handcuffs and the pat-down search here were not justified.

### C. Application of the Exclusionary Rule

It has long been established that "any evidence recovered or derived from an illegal search and seizure" must be excluded from evidence.[37] As the United States Supreme Court has held "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such

---

individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). But an officer cannot arrest the occupant of a vehicle during a traffic stop for an *unrelated criminal offense* unless the officer has probable cause to believe that the person has committed the unrelated criminal offense.

**34.** *See* 11 *Del. C.* § 1902 (permitting officers to "stop any person abroad who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime . . . .").

**35.** *Hicks v. State*, Del.Supr., 631 A.2d 6, 7 (1993); *Robertson v. State*, Del.Supr., 596 A.2d 1345, 1352 (1991) (" '[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where . . . a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' ") (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); 11 *Del. C.* § 1903 (au-

thorizing officer to search for "a dangerous weapon any person whom the officer has stopped or detained as provided in § 1902 . . . whenever the officer has reasonable ground to believe that the officer is in danger if the person possesses a dangerous weapon"); *cf. Pennsylvania v. Mimms*, 434 U.S. 106, 111–12, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (applying *Terry* analysis to pat-down search during a traffic stop and finding that a "bulge" in the driver's jacket "permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer").

**36.** *Jones*, 745 A.2d at 872 n. 78 (quoting *United States v. Johnson*, 7th Cir., 170 F.3d 708, 718 (1999)).

**37.** *Jones v. State*, Del.Supr., 745 A.2d 856, 872–73 (1999) (citations omitted); *see also Rickards v. State*, Del.Supr., 77 A.2d 199, 205 (1950) ("The most effective way to protect the guarantees against unreasonable search and seizure and compulsory self-incrimination is to exclude from evidence any matter obtained by a violation of them.").

invasions."[38] Where evidence is the indirect product of an illegal search and seizure, we must ask whether the discovery of the evidence came about "by exploitation of that illegality" or whether the State can show a break in the chain of events such that the evidence was not a product of the constitutional violation.[39]

 In this case, the police found the cocaine in Caldwell's car following, and by exploitation of, the unlawfully protracted and intrusive detention. We therefore hold that Caldwell's rights under the Fourth Amendment of the United States Constitution were violated. Consequently, we hold that the evidence uncovered in the later search is not admissible in the State's

case-in-chief against Caldwell. The Superior Court erred, as a matter of law, by denying Caldwell's motion to suppress that evidence.[40]

### Issuance of the Nighttime Search Warrant

 The next issue that Caldwell raises on appeal concerns whether the issuance of a nighttime search warrant satisfied the requirements of 11 *Del. C.* § 2308.[41] Specifically, Caldwell argues that the application for the warrant did not provide facts supporting a finding that a nighttime search was "necessary in order to prevent the escape or removal of the person or thing to be searched for," as required by 11 *Del. C.* § 2308.[42] The Su-

---

**38.** *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)); *see also Hicks*, 631 A.2d at 12 ("The officer's persistence in relocating Hicks and reexamining his pouch was an illegal search and seizure, the result of which is that all evidence so obtained, either directly or indirectly, must be suppressed.").

**39.** *Id.* (" '[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' ") (quoting Maguire, Evidence of Guilt, 221 (1959)); *see also Segura v. United States*, 468 U.S. 805 (1984) (applying *Wong Sun* standard); *State v. Wrightson*, Del.Super., 391 A.2d 227, 229 (1978) (same).

**40.** Even assuming that Caldwell gave the officer consent to search his car, such consent is generally insufficient to cleanse the taint from an ongoing illegal detention. *See State v. Cooley*, Del.Supr., 457 A.2d 352, 356 (1983) ("Any implied consent attributable to Cooley was given under circumstances which did not dissipate the effect of the illegal arrest."); *Wrightson*, 391 A.2d at 229 (excluding evidence uncovered in consensual search during illegal detention after a traffic stop because it was an "exploitation of the illegal detention"); *State v. Morris*, Del.Super., Cr. ID No.

9610010230, Goldstein, J., 1997 WL 363938 (May 14, 1997) ("[C]onsent to search given when a defendant is being illegally detained is tainted by the illegality and is ineffective to justify the search.") (citations omitted); *State v. Thomason*, Del.Super., Cr.A.Nos. IN92–07–0022, IN92–07–0023, IN92–07–0024, IN92–07–0025, Goldstein, J., 1994 WL 637294 (Mar. 14, 1994) (same); *State v. Huntley*, Del.Super., 777 A.2d 249 (2000) (same); *see also People v. Banks*, 85 N.Y.2d 558, 626 N.Y.S.2d 986, 650 N.E.2d 833, 835 (1995); *United States v. Chavez–Villarreal*, 5th Cir., 3 F.3d 124, 128 (1993) ("[C]onsent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will.").

**41.** 11 *Del. C.* § 2308 provides:

A search warrant shall not authorize the person executing it to search any dwelling house in the nighttime unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person or thing to be searched for, and then the authority shall be expressly given in the warrant.

**42.** Caldwell does not argue on appeal that the warrant application was defective because it failed to show probable cause. He also does not argue that the search of the trailer was tainted by the illegal detention, or the later

perior Court held that a nighttime search warrant was necessary in this case because "it was likely that [Caldwell's] family was well aware of his situation and would attempt to destroy any contraband that they possessed in their various residences," including the trailer.[43] We review this decision of the Superior Court to deny a motion to suppress evidence for an abuse of discretion.[44]

 In applying Section 2308, we have held that the language of the provision "is clear and unambiguous and requires more than probable cause. It requires a determination that such action is necessary 'to prevent the escape or removal of the person or thing to be searched for.' "[45] In determining whether the issuance of a nighttime warrant satisfies the statutory requirements, we, like the Superior Court, may look only to the facts presented in the affidavits supporting the warrant application.[46] But we also apply "the settled principle that the factual sufficiency of an affidavit is tested by consider-ing it as a whole and not in terms of its isolated component allegations."[47]

The State argues that a nighttime search warrant was justified in this case because "it was logical to infer that Caldwell's family who appeared to be involved in his cocaine dealing enterprise would quickly become aware of his arrest on July 10, 1998 and attempt to remove or destroy the cocaine stash maintained at the mobile home."[48] The justice of the peace who issued the warrant followed this same logic, relying on the following passage from the officers' affidavit: "Your affiants believe that extreme circumstances exist for the execution of a nighttime search warrant. Your affiants believe that upon notification of Fred Caldwell's arrest other co-conspirators and or family members will destroy and or remove the remaining drugs and drug paraphernalia from the residence."[49]

Caldwell argues that this concern is implausible because: (1) he was in custody and there is no indication that his alleged

search, that we discuss above. In any event, the bulk of the facts in the search warrant application concerning the alleged drug conspiracy were collected well before the traffic stop.

**43.** *Caldwell*, 10/22/99, Mem Op. at ¶ 18.

**44.** *See Seward v. State*, Del.Supr., 723 A.2d 365, 370 (1999).

**45.** *Mason v. State*, Del.Supr., 534 A.2d 242, 251 (1987).

**46.** *See Henry v. State*, Del.Supr., 373 A.2d 575, 577 (1977) ("[S]ufficient facts showing that a nighttime search is necessary to prevent the escape or removal of the person or thing to be searched for must appear on the face of the affidavit before such a search may be authorized.").

**47.** *Dunfee v. State*, Del.Supr., 346 A.2d 173, 175 (1975).

**48.** The State does not argue that there was a danger that Caldwell would be released from custody and would himself return to the trailer before morning on the next day. *Cf. Dixon v. State*, Del.Supr., 567 A.2d 854, 856 (1989) (permitting nighttime search warrant where owner of premises was aware of impending search and expected to be released from police custody during the night); *Jensen v. State*, Del.Supr., 482 A.2d 105, 111 (1984) (same); *Jackson v. State*, Del.Supr., 643 A.2d 1360, 1366–67 (1994) (same).

**49.** The application for a nighttime warrant states:

Your affiants feel that due to the recent vehicle stop and arrests for controlled substances of Fred Caldwell and Isaac Willey, [sic] it is imperative that your affiants execute search warrants at the residences ... with the utmost urgency to avoid the destruction of vital evidence used to prosecute these drug distributors.

co-conspirators were aware of the arrest;[50] (2) he was apparently unaware that the police planned to execute a search warrant on the trailer; and (3) there is no indication that other persons would find out about his arrest before the next morning.

In our view, the State's asserted concern was sufficient to justify a nighttime search warrant. The warrant application indicates that Caldwell was involved with several other individuals who, if alerted to his arrest, might seek to destroy evidence in the trailer. Whether or not these concerns later materialized, in fact, is irrelevant. The officers and the magistrate were entitled to rely on "their reasonable expectations" in requesting and approving the warrant.[51]

The issuing court cannot merely rely on a conclusory allegation that a co-conspirator may get wind of an arrest and attempt to destroy evidence located in the premises to be searched. The application must also include averments that support such an assertion—for example, averments describing the conspiracy and indicating that the coconspirators are in the vicinity or have access to the premises.

In this case, the warrant application included a detailed description of a drug distribution operation that was coordinated by Caldwell and several members of his family. These averments, together with the averment that Caldwell's arrest may have alerted his family members to the police investigation, are sufficient to justify a reasonable concern that the family members would attempt to destroy evidence in the house trailer before the police could execute a daytime search of the trailer. We therefore conclude that the Superior Court did not abuse its discretion in denying Caldwell's motion to suppress the evidence uncovered as a result of the nighttime search of the trailer.

### Denial of Caldwell's Motion to Sever the Charges

Caldwell next argues that the court abused its discretion in denying his motion to sever the two sets of charges against him—one set based on the evidence found during the traffic stop and one set based on the evidence found in the trailer. The State counters that the charges against Caldwell were properly joined because the charges all related to Caldwell's alleged drug distribution operation. The Superior Court denied Caldwell's motion because both sets of charges related to the same underlying course of conduct, namely, Caldwell's drug distribution operation.[52]

The joinder of charges under Superior Court Criminal Rule 8(a) is designed to promote judicial economy by per-

---

**50.** Caldwell also observes that he maintained several different residences and that "there would be nothing alarming in Caldwell's failure to return to any of the locations [after his arrest] which would trigger the removal or destruction of evidence."

**51.** Cf. *Jackson*, 643 A.2d at 1367 ("In applying for the warrant, the police were not required to peer into the future and accurately forecast the night's developments. They were entitled to rely upon reasonable expectations. Similarly, the facts known to the magistrate when he signed the warrant, not those which developed at some later time, are the relevant facts in assessing the need for a nighttime search."); *Dixon v. State*, Del.Supr., 567 A.2d 854, 856 (1989) ("Given the possibility that the defendants would make bail during the night, the police had a reasonable basis to believe that if the search warrant were not executed that evening the evidence would be destroyed."); *Dunfee*, 346 A.2d at 175 (finding affidavit sufficient to support a nighttime search warrant because it stated that the object of the search was marijuana that was expected to be sold that evening).

**52.** See *Caldwell*, Order Denying Severance Motion at ¶ 3.

mitting the State to try related charges together.[53] The Superior Court has discretion to order separate trials "if it appears that the defendant is prejudiced by a joinder of offenses in an indictment."[54]

On appeal, we review the trial court's denial of a motion to sever charges for an abuse of discretion.[55] A new trial is warranted only if the defendant can show that there is a reasonable probability that a joint trial caused substantial prejudice to the defense.[56] As a general matter, prejudice in this context arises where:

1) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; 2) the jury may use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and 3) the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges.[57]

Caldwell contends that two of these categories of prejudice are present in this case. Caldwell first argues that he was prejudiced by the joinder of the two sets of charges because the admission of the drugs and paraphernalia uncovered in the traffic stop made it difficult for him to prove that he was not associated with the drugs found in the trailer. As result, he contends, the jury may have inferred that the drugs in the trailer belonged to him from the fact that drugs were found in his car—a conclusion that the jury would not have reached in the absence of evidence about the traffic stop. Caldwell further argues that the jury may have inferred a "general criminal disposition" from the two sets of charges and convicted him of some offenses on that basis.

As the Superior Court found, however, all of the drug offenses in the indictment are "of a similar character" because they all relate to the same cocaine distribution operation.[58] Although the two sets of charges are not necessarily "inextricably intertwined" because each set of charges could theoretically be proven without reference to the other,[59] they are nevertheless a part of the same "common scheme" or course of conduct within the meaning of Criminal Rule 8(a).[60] Moreover, the trial

**53.** Superior Court Criminal Rule 8(a) provides:

Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are basec on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.

**54.** *Wiest v. State*, Del.Supr., 542 A.2d 1193, 1195 (1988).

**55.** *See Wiest*, 542 A.2d at 1195; *see also Weddington v. State*, Del.Supr., 545 A.2d 607, 615 (1988); Super. Ct.Crim. R. 14. As we held in *Lilly v. State*, Del.Supr., 649 A.2d 1055, 1059 (1994), "[a]n abuse of discretion occurs when 'a court has ... exceeded the bounds of reason in view of the circumstances,' [or] ... so

ignored recognized rules of law or practice ... to produce injustice."

**56.** *See Bates v. State*, Del.Supr., 386 A.2d 1139, 1141 (1978).

**57.** *Wiest*, 542 A.2d at 1195 (citations omitted).

**58.** *See Caldwell*, Order Denying Severance Motion at ¶ 3; Super. Ct. Crim R. 8(a).

**59.** *Younger v. State*, Del.Supr., 496 A.2d 546, 550 (1985) ("Where proof of more than one crime is 'so inextricably intertwined so as to make proof of one crime impossible without proof of the other,' ... the offenses should not be severed.") (internal citation omitted).

**60.** *Cf. Brown v. State*, Del.Supr., 310 A.2d 870, 871 (1973) ("We believe that the three counts which were of the same general character and involved a similar course of con-

court properly instructed the jurors that they "should consider each of the counts separately and reach a separate verdict on each count."[61]

■■■■ We also note that Wiley's testimony was a key element of the State's case on both sets of charges against Caldwell. As a general rule, a trial court deciding on a motion to sever charges may consider whether all of the evidence to be presented on one set of charges is admissible with respect to the other charges in the indictment.[62] Caldwell correctly observes that Wiley's testimony concerning the drugs in Caldwell's car would be admissible in a separate trial for the charges related to the drugs in the trailer only if the testimony satisfied D.R.E. 403 and 404, which permit the trial court to exclude evidence that is unfairly prejudicial or that reflects a defendant's prior bad acts.[63] But the trial court would not be *required* to exclude Wiley's testimony under these rules or under our holding in *Getz v. State*[64] because the testimony provides

probative evidence of Caldwell's intent to distribute the cocaine in his possession and connects Caldwell to the overarching cocaine distribution operation. Thus, the potential admission of Wiley's testimony in a joint trial did not mandate, or even weigh heavily in favor of, severance of the two sets of charges.

Although Caldwell presents valid concerns about the joinder of offenses in his trial, the trial court in this case could properly conclude that the court's interest in judicial economy outweighs these concerns. As a consequence, we conclude that the trial court's refusal to sever the offenses did not constitute an abuse of discretion.

### Trial Court's Failure to Record Sidebar Conferences

■■■■ Caldwell's counsel on appeal argues that the trial court's failure to record seven sidebar conferences has prejudiced his ability to prosecute his appeal.

duct and which were alleged to have occurred within a relatively brief period of time were properly tried together."); *Skinner v. State*, Del.Supr., 575 A.2d 1108, 1118 (1990) (permitting joinder of charges relating to "three incidents which occurred during a 10½ hour time span" that involved different victims); *Fortt v. State*, Del.Supr., 767 A.2d 799, 803–04 (2001) ("Severance is not required *ipso facto*, simply because the alleged charges involve different victims and occur at separate times.... '[W]here offenses are of the same general character, involve a similar course of conduct and are alleged to have occurred in a relatively brief span of time it is proper to try the offenses together.' ") (quoting *Younger v. State*, Del.Supr., 496 A.2d 546, 550 (1985)). The situation in the present case is not as extreme as the situation in *State v. McKay*, Del.Super., 382 A.2d 260 (1978). In *McKay*, the Superior Court ordered a severance of the offenses because the case involved eight indictments, nine defendants, and thirty-five charges against one of the defendants. *See id.* at 262.

61. *See Steckel v. State*, Del.Supr., 711 A.2d 5, 9 (1998) ("Further, any prejudice to Steckel [from the joinder of charges] was diminished by the jury instruction."); *see also Fortt*, 767 A.2d at 804 (suggesting that the jury instruction minimized prejudice from joinder of charges). The jury in *Steckel* received essentially the same instruction as the jury in the present case. *See Steckel*, 711 A.2d at 9 n. 4.

62. The State does not need to prove that the evidence would be admissible in both trials. *See Skinner*, 575 A.2d at 1118 ("Although reciprocal admissibility is not a prerequisite for initial joinder, reciprocal admissibility is a pertinent factor for the trial court to consider.").

63. *See Steckel v. State*, Del.Supr., 711 A.2d 5, 9 (1998) (citing *Getz v. State*, Del.Supr., 538 A.2d 726, 730 (1988)).

64. Del.Supr., 538 A.2d 726, 730 (1988) (placing limitations on the admission of evidence of a defendant's prior bad acts).

To prevail on this claim in the absence of a timely objection at trial, the defendant must show that the trial court's omission prejudices the defense on appeal.[65] The State argues that the unrecorded sidebar conferences did not involve legal rulings or substantive discussions and that Caldwell cannot show prejudice from the trial court's failure to make a record of these conferences.

At oral argument, we directed the parties to reconstruct, if possible, the discussions that took place off the record. In response, the trial prosecutor submitted a statement describing the subject matter of these discussions, and Caldwell's trial counsel has confirmed the basic accuracy of the prosecutor's account. Based on a review of these submissions, we have concluded that all of the unrecorded sidebar conferences covered scheduling and other non-substantive issues. As a result, Caldwell cannot show prejudice from the trial court's failure to record these conferences.

■■■ Although our decision to reverse in this case renders the issue moot, we take this opportunity to re-emphasize the importance of making a record of all substantive sidebar conferences or, where appropriate, stating contemporaneously for the record the subject matter of any non-substantive discussions. We have "repeatedly stated that all sidebar conferences, except those involving non-substantive issues, must be recorded." [66] We have also made it clear that "the absence of a complete record of all pertinent exchanges between a trial judge and counsel was distressing and likely to constitute reversible error in a foreseeable situation," particularly where the conference involved decisions of the trial court that affect the defendant's fundamental rights.[67]

### *Juror's Belated Disclosure of her Friendship with a Lawyer in the Attorney General's Office*

■■■ At some point during the defense case, the prosecutor discovered and immediately disclosed (1) that one of the jurors was a close personal friend of the wife of Dennis Kelleher, a lawyer in the Attorney General's office, and (2) that the juror

---

**65.** Before the addition of Super. Ct.Crim. R. 26.1, the Court held that "where the defendant failed to timely object, there is no basis upon which to find reversible error, absent a showing of prejudice." *Deputy v. State,* Del. Supr., 500 A.2d 581, 594–95 (1985). Although Rule 26.1 is mandatory, the defendant must show prejudice from the failure to record sidebars—particularly where, as here, the defendant fails to make a timely objection at trial. *See id.* n. 20 ("Despite the mandatory nature of reporting, the failure to report side bar conferences even in death penalty cases does not amount to reversible error, absent a showing of prejudice."); *Stephenson v. State,* Del.Supr., 606 A.2d 740, 741 (1992) ("The recording of all substantive sidebar and chambers conferences is and has been mandatory."); *see also Owens v. State,* Del.Supr., No. 497, 1989, Christie, C.J., 1990 WL 254366 (Nov. 28, 1990) (ORDER), Order at ¶ 9 ("Appellant makes no showing that he was prejudiced by the failure to report these side-

bar conferences and our review of the record reflects none.").

**66.** *Sudler v. State,* Del.Supr., 611 A.2d 945, 947 (1992) (citations omitted); *see also* Super. Ct.Crim. R. 26.1 ("All sidebar conferences and chambers conferences during trial shall be recorded unless the trial judge determines, in advance, that neither evidentiary nor substantive issues are involved.").

**67.** *Stephenson,* 606 A.2d at 741 n. 2. In determining whether the defendant is prejudiced on appeal by the failure to record sidebar conferences in a given case, we look to whether the incomplete record impedes appellate review or hampers the efforts of substitute counsel on appeal. *See Ross v. State,* Del. Supr., 482 A.2d 727, 735 (1984) ("[W]e find the complained-of omissions [in the trial record] did not deprive defendant of meaningful appellate review or of the effective assistance of substitute counsel on appeal.").

socializes regularly with Kelleher. Following this discovery, defense counsel moved for a mistrial because the juror's failure to disclose the relationship interfered with the exercise of Caldwell's peremptory challenges in jury selection.[68]

During a brief interview with the trial judge, the juror asserted that she had mentioned to Mrs. Kelleher that she was assigned to a criminal trial but did not discuss the substance of the case with Mrs. Kelleher or her husband. Based on this interview, the trial court concluded that the juror "did not discuss any aspect of this case with either Mr. Kelleher or his wife" and that she "would be fair and impartial." [69] We review the trial court's decisions on the "mode and depth of investigative hearings into allegations of juror misconduct" and on the remedy for such misconduct for an abuse of discretion.[70]

Where a juror's potential bias is discovered during trial, courts are necessarily concerned that the juror's bias will taint the jury's verdict and that the appearance of bias will undermine public confidence in the verdict.[71] As the Superior Court observed in this case, "if only one juror is improperly influenced, a defendant in a criminal case is denied his Sixth Amendment right to an impartial jury." [72] In addition, it is more difficult for counsel to exercise the right to strike potentially biased jurors if relevant information is not uncovered during the jury selection process.[73] The situation becomes much more serious where, during jury selection, a juror deliberately misrepresents or conceals a relationship with one of the parties or with counsel when requested to reveal any such relationship.[74]

The juror misconduct in the present case, however, does not present this concern because the juror was not specifically questioned in *voir dire* about friendships with lawyers in the Attorney General's office. Before jury selection, defense counsel replaced the standard *voir dire* question, "Do you know anybody who works in the office of the Attorney General?" with the question "Do you know any of the attorneys *in this case* or have any of you ever been represented by the attorneys in this case or for the law firms for which they work, either now or in the past." The question then listed the lawyers in the case. Caldwell argues that a "fair reading" of this question "put the

**68.** Here again, our decision to reverse in this case renders the issue moot, but we find it appropriate to address the issue in the interest of justice.

**69.** The trial court also denied Caldwell's motion for a new trial for essentially the same reason. *See State v. Caldwell,* Del.Super., Cr.A. Nos. IK98–07–0540, 0541, 0543, and 0545 through 0549, 2000 WL 141287 (Feb. 4, 2000) (ORDER) (denying motion for new trial).

**70.** *Massey v. State,* Del.Supr., 541 A.2d 1254, 1257 (1988) (citations omitted).

**71.** *Jackson v. State,* Del.Supr., 374 A.2d 1, 2 (1977) ("Jury prejudice and bias, either actual or apparent, may not be allowed to derogate from society's confidence in its judicial sys-

tem."); *see also Hughes v. State,* Del.Supr., 490 A.2d 1034 (1985) ("An essential ingredient of that [Sixth Amendment] right is that the jury consist of impartial or indifferent jurors.").

**72.** *See Caldwell,* Order Denying Motion for New Trial at ¶ 2 (citing *Styler v. State,* Del. Supr., 417 A.2d 948, 950–51 (1980)).

**73.** *See Jackson,* 374 A.2d at 2 ("That right of challenge is seriously impaired by a juror's voir dire denial or nondisclosure of a relationship to an attorney in the case, or to a member of his firm or staff.") (citations omitted).

**74.** *See id.* ("[T]he offense to the system is aggravated when, as in the present case, the juror was aware of the relationship and his nondisclosure deliberate.").

juror on notice" that she was required to disclose her friendship with Kelleher and his wife.[75] We disagree. Although a full disclosure of all possible connections to the Attorney General's Office would have been ideal, the fact remains that Caldwell's question did not explicitly request information about the juror's relationship with other prosecutors. It would therefore be inappropriate to characterize the juror's answer to the question as "intentionally misleading."

■ Because Caldwell cannot "show that the circumstances surrounding the [juror] misconduct were so egregious and inherently prejudicial so as to support a presumption of prejudice to defendant," he must prove that the juror's presence on the panel prejudiced him.[76] There is no prejudice in this case that rises to the magnitude of that addressed in *Hughes v. State*.[77] In *Hughes*, the Court reversed a conviction after a "post-conviction hearing reveal[ed] that jurors were aware of defendant's prior conviction for the same offense

and/or his submission to a polygraph examination."[78]

The juror in the present case, by contrast, merely told the wife of a Deputy Attorney General that she was serving on a jury in a criminal case. There is no indication that she discussed the substance of Caldwell's case with the Kellehers or encountered outside information about the case. Moreover, there is no reason to question the trial court's finding that the juror "would be fair and impartial."[79] We therefore conclude the trial court did not abuse its discretion in denying Caldwell's motion for a mistrial, or his later motion for a new trial, on this basis.[80]

### Conclusion

Because we find that the officer's decision to handcuff and detain Caldwell was outside the scope of the traffic stop and was not supported by independent facts sufficient to warrant such an intrusion, we conclude that the Superior Court erred as a matter of law in denying Caldwell's mo-

---

**75.** In denying Caldwell's motion for a mistrial, the Superior Court observed that "the question propounded to the juror could lead someone to conclude that it does not apply to another member of the Attorney General's Office" and found that "this juror has faithfully abided by the Court's admonitions."

**76.** *Massey v. State*, Del.Supr., 541 A.2d 1254, 1255 (1988).

**77.** Del.Supr., 490 A.2d 1034, 1043–44 (1985).

**78.** *Id.* The present case does not present the concern we found in *Flonnory v. State*, Del. Supr., 778 A.2d 1044, (2001). In *Flonnory*, a juror was told outside the courtroom that the defendant in that case had participated in another murder. The juror then relayed this information to all of the other jurors. We concluded that the communication of this information to the jurors violated the defendant's constitutional right to a fair trial by an impartial jury. *Cf. Capano v. State*, Del.Supr., — A.2d —, ——–—, 2001 WL 980939,

slip op. at 143–48. (Aug. 10, 2001) (no prejudice shown as a result of regrettable but inconsequential conversation between jurors in separate cases).

**79.** *See Hughes*, 490 A.2d at 1040 ("The Supreme Court has held that a prospective juror's knowledge of the facts and issues of the case, or even a preconceived notion of guilt or innocence of a criminal defendant, will not automatically disqualify a juror, 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' ") (quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).

**80.** It would appear from the trial transcript that defense counsel moved for a mistrial but did not move to excuse the juror. We note· that, since deliberations had not begun at the time that the juror's friendship with the Kellehers was discovered, the trial court could properly grant a motion to excuse the juror while denying the motion for a mistrial.

tion to suppress the evidence that was discovered as a product of the illegal detention. Accordingly, we reverse the judgment of the Superior Court. We find no error in the trial court's decisions denying Caldwell's motion to suppress evidence uncovered in the nighttime search of his trailer and denying Caldwell's motion to sever. The other issues raised by Caldwell on appeal are moot. This case is remanded for proceedings consistent with this Opinion.