IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEITH GIBSON, | § | |
| | § | No. 111, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 2107000514A/B |
| | § | 2106004704A |
| Plaintiff Below, | § | 2106004632A |
| Appellee. | § | 2107000202A |

Submitted: April 2, 2025
Decided:  May 28, 2025

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

## ORDER

After consideration of the parties' briefs, oral arguments, and the Superior Court record, it appears to the Court that:

(1)    On July 6, 2021, Keith Gibson ("Gibson") was indicted in a forty-one-count indictment.  His charges included Murder First Degree (four counts); Attempted Murder First Degree (one count), and multiple counts of Robbery First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), and Possession of a Firearm by a Person Prohibited ("PFBPP").  The charges stemmed from five separate criminal investigations that took place between May 15, 2021, and June 8, 2021.  All of Gibson's purported crimes in this case took place either in the City of Wilmington or the contiguous Town of Elsmere, Delaware.

(2)     The State alleged that on May 15, 2021, Gibson shot and killed Metro PCS employee, Leslie Basilio ("Basilio"), while robbing the store where she worked in Elsmere.  Gibson was also accused of stealing her car.  On June 5, 2021, Gibson allegedly shot and killed drug-dealer Ronald Wright ("Wright") and stole his sling bag and drugs.  The next day, June 6, 2021, Gibson allegedly shot and attempted to kill Belal Almansoori ("Almansoori") while robbing the Good Guys deli where Almansoori worked.  During the early morning hours of June 8, 2021, Gibson allegedly stole Secret Harris's ("Harris") phone, hit her with a gun, and shot at her fleeing car.  Later that morning, Gibson (along with an alleged co-conspirator, Alexander Delgado) allegedly robbed a Rite Aid and threatened an employee, Sandra Collins.

(3)     On May 9, 2022, Gibson moved to sever his charges for separate trials.[1]  The Superior Court granted severance but on different terms than Gibson had requested.[2]  The Superior Court divided the counts into three groupings: (i) the Basilio, Wright, Almansoori, and Collins cases (collectively, the "Group 1 Cases"); (ii) the Harris case; and (iii) the drug-dealing case.[3]  The Superior Court further severed the person-prohibited charges within each grouping.

---

[1]  App. to Opening Br. at A6, at Docket Item ("D.I.") 37.

[2]  *State v. Gibson*, 2022 WL 16642860, at *1–4 (Del. Super. Nov. 2, 2022) [hereinafter "November 2022 Order"].

[3]  The drug-dealing case was based on Gibson's possession of drugs at the time of his arrest on June 8, 2021.  As listed in the indictment, the specific charges in counts 35–41 are: (35) drug

(4)  Gibson also moved to suppress evidence seized from his iPhone.[4]  The Superior Court denied the motion.[5]

(5)  The State filed a motion to admit evidence of Gibson's prior bad acts, including video evidence of a robbery and murder at a Dunkin' Donuts in Philadelphia, under D.R.E. 404(b).[6]  The Superior Court granted the motion in part and denied it in part, allowing admission of the Dunkin' Donuts video.[7]

(6)  The "A" portion of the Group 1 Cases (all counts except the person-prohibited charges) proceeded to trial on October 31, 2023.[8]  During the State's case-in-chief, Gibson objected to the admission of certain sales receipts as hearsay.[9]  Gibson also objected to a witness's testimony as to the meaning of a slang term, arguing that it was hearsay and lacked a proper foundation.[10]  The Superior Court overruled both objections.[11]

---

dealing (possession with intent to deliver cocaine), (36) drug dealing (possession with intent to deliver marijuana), (37) PFDCF, (38) wearing body armor during the commission of a felony, (39) PABPP, (40) PFBPP, and (41) PDWPP.  *See* App. to Opening Br. at A148–50.

[4]  App. to Opening Br. at A6, at D.I. 33.

[5]  *State v. Gibson*, 2023 WL 7004105, at *1–5 (Del. Super. Oct. 23, 2023) [hereinafter "October 2023 Order"].

[6]  *See id.* at *8–10.  This motion was filed under seal and does not have a docket item number.  *Id.* at *1 n.3.

[7]  *Id.* at *8–13.

[8]  App. to Opening Br. at A20, at D.I. 126.

[9]  *Id.* at A256–57.

[10]  *Id.* at A274–75.

[11]  *Id.* at A269–71, A274–76.

(7) During the middle of the trial, the State dismissed the charge of second-degree assault and the related count of PFDCF.[12] The jury found Gibson guilty of the remaining twenty-one counts: (i) four counts of First-Degree Murder; (ii) one count of Attempted First-Degree Murder; (iii) four counts of First-Degree Robbery; (iv) nine counts of PFDCF; (v) one count of wearing body armor during the commission of a felony (WBADCF); (vi) one count of Theft of a Motor Vehicle; and (vii) one count of Second-Degree Conspiracy. Following the verdict, a second trial was held on the "B" portion of the Group 1 Cases, the person-prohibited charges.[13] The jury convicted Gibson of all four counts of PFBPP.

(8) On March 8, 2024, the Superior Court sentenced Gibson to seven life sentences plus 297 years in prison. This appeal followed.

(9) At the core of his appeal, Gibson argues that he did not receive a fair trial due to the trial court's alleged errors in admitting unduly prejudicial evidence and by refusing to sever the murder charge of the drug dealer from the other charges. For reasons we explain below, we AFFIRM the Superior Court's judgment of conviction.

---

[12] *Id.* at A20, at D.I. 126.

[13] *Id.* at A32, at D.I. 45.

4

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. The Leslie Basilio Murder

(10)   Leslie Basilio was a store clerk who worked at the Metro PCS in Elsmere.[14]  On May 15, 2021, Kristen Dziegielewski was sitting outside of her home nearby when she noticed a man wearing a sweatshirt that covered most of his face who seemed "slightly out of the norm."[15]  He rode a bicycle around the area multiple times before turning toward the Metro PCS store where Basilio was working.

(11)   Shortly after, surveillance video captured a masked man walking into the MetroPCS with a revolver in his right hand.[16]  He killed Basilio by shooting her in the head at close range and then stole more than twenty cell phones.[17]  He also stole Basilio's Cadillac Escalade.[18]

(12)   Gibson's friend Amanda Masteller later watched the surveillance video and identified Gibson as the shooter.[19]  Four days later, the police also located Basilio's vehicle within walking distance of Gibson's home in Philadelphia.[20]

---

[14]  App. to Answering Br. at B6.

[15]  *Id.* at B7.

[16]  *Id.* at B117–19.

[17]  *Id.* at B16–17, B30.

[18]  *Id.* at B19–20, B24, B30.

[19]  *Id.* at B117–18.

[20]  *Id.* at B19–20, B24.

(13)   On the day of the murder, police found a Retrospec bicycle about a block and a half away from the MetroPCS store.  The bicycle manufacturer told police that only five dealers in the area sold their bicycles and all five were in Pennsylvania.  A bicycle shop in North Philadelphia had a sales receipt showing that a customer named "Keith Gibson" bought a blue Retrospec bicycle with the serial number TH200510751 on January 23, 2021.[21]  The shop had two more relevant receipts: one showing that "Keith Gibson" dropped off his bicycle for service on May 13, 2021, and the second showing that "Keith Gibson" had paid for the service and purchased a bike lock on May 14, 2021.[22]

(14)   The serial number on the bicycle the police found matched the serial number on the sales receipt.[23]  When Gibson was later arrested, he was in possession of keys that fit the bike lock found with the bicycle.[24]  Masteller also testified that the bicycle belonged to Gibson and that she had last seen Gibson with it in May 2021.[25]  When she asked what happened to the bike, Gibson told her it was stolen while he was "doing a lick," which she testified meant "committing a robbery."[26]

---

[21]  *Id.* at B99–100.

[22]  *Id.* at B100.

[23]  *Id.* at B100, B114.  State's Exhibit 6 was the actual bicycle.  It was brought into the courtroom. App. to Opening Br. at A120.

[24]  Trial Transcript, Nov. 8, 2023, afternoon session, at 23–24 (Sowden Test.)

[25]  App. to Answering Br. at B114, B116.

[26]  *Id.* at B115–16.

(15)   The day after the murder, one of the stolen phones was activated under the name "Navone Stinson."[27]   After finding Stinson and seizing the phone, police discovered that a contact in the phone was labeled "The Beast"—Gibson's nickname—and had the same phone number that Gibson provided when he was arrested.[28]   When police later examined the contents of Gibson's cell phone, they discovered that on the day of Basilio's murder, the phone showed no activity between 4:43 p.m. and 6:30 p.m., suggesting that Gibson had turned off the phone during the time when Basilio was murdered.[29]

(16)   A forensic firearms examiner analyzed the bullet that killed Basilio.[30] The bullet was too damaged to make direct comparisons, but it was coated with a dark-blue nylon material consistent with Nyclad.[31]   The examiner had not seen bullets coated with Nyclad for twenty years, despite conducting thousands of examinations during that time.[32]

---

[27]  *Id.* at B30–31.

[28]  *Id.* at B31.

[29]  *Id.* at B89–90.

[30]  *Id.* at B103–04.

[31]  *Id.* at B104.

[32]  *Id.* at B104–05.

## B. The Ronald Wright Murder

(17)   Ronald Wright was a drug dealer who sold crack cocaine from his friend's home and usually kept his drugs in a black sling bag.[33]  On June 5, 2021, Wright's friend Walter Davis was leaving the house when an unknown man knocked at the door.  The man had a dark complexion, was clean shaven, and wore glasses and a hooded sweatshirt.

(18)   Davis was standing about fifty feet from his doorstep when he heard a muffled boom and saw two addicts who hung around the house running from it. Davis called 911.  When the police arrived, they found Wright lying on his back with trauma to his head.  EMS pronounced him dead on the scene.

(19)   The police were unable to locate any shell casings at the scene, but they found what appeared to be fragments of a projectile underneath Wright's body.[34]  A forensic firearms examiner determined that the fragments were two portions of a frangible bullet—a bullet designed to break apart upon impact.[35]  The portions were not suitable for comparison but belonged to the .38-caliber class and had eight lands, eight grooves, and a right-hand twist. [36]

---

[33]  *Id.* at B35, B86, B150–51.

[34]  *Id.* at B56–58.

[35]  *Id.* at B137.

[36]  *Id.* at B137–38.

(20) Amanda Masteller later identified Gibson as the man walking around in surveillance footage from the area.[37] When Gibson was later arrested, police seized a sling bag from him that Wright's sister identified as Wright's sling bag.[38] Thomas Nicastro, who purchased drugs from Wright, also testified that the recovered bag resembled the bag that Wright used.[39]

*C. The Belal Almansoori Attempted Murder*

(21) On June 6, 2021, Gibson shot and wounded Belal Almansoori while robbing the Good Guys deli where Almansoori worked.[40] Almansoori was found with gunshot wounds to his head and body. Condoms were found on the floor near his body.[41] Almansoori survived the shooting but spent months in the hospital and in recovery.[42]

(22) The surveillance footage showed Gibson carrying a revolver in his right hand and firing multiple shots toward Almansoori's head.[43] Gibson was wearing

---

[37] *Id.* at B118.

[38] *Id.* at B150–51.

[39] *Id.* at B86.

[40] Trial Transcript, Nov. 7, 2023, at 143–47 (Almansoori Test.); Trial Transcript, Nov. 2, 2023, afternoon session, at 36 (Tome Test.).

[41] Trial Transcript, Nov. 2, 2023, afternoon session, at 36 (Tome Test.), 46–47 (Stier Test.), 70 (Verna Test.); Trial Transcript, Nov. 7, 2023, at 147 (Almansoori Test.).

[42] Trial Transcript, Nov. 7, 2023, at 147 (Almansoori Test.).

[43] App. to Answering Br. at B118. (Masteller Test., commenting on State's Exs. 31, 301, 302, and 303).

gloves with a logo that appeared to resemble Copper Fit's.[44]  The police recovered

fragments of frangible bullets from the scene that were also .38-caliber class bullets,

with eight lands, eight grooves, and a right-hand twist.[45]

(23)  Amanda Masteller later identified Gibson from the surveillance

video.[46]  A second witness, Reyna Medina, saw Gibson in the area around the time

of the shooting.[47]  When Gibson was later arrested, he was carrying the same style

of condoms found near Almansoori's body and sold by the Good Guys deli.[48]

*D. The Rite Aid Robbery*

(24)  On June 8, 2021, Gibson and his alleged co-conspirator, Alexander

Delgado, entered the Rite Aid where Sandra Collins worked as a cashier.[49]  Both

men wore hooded sweatshirts, masks, and gloves.[50]  Gibson held a revolver in his

right hand and pointed it at Collins while he handed her a bag and demanded money

---

[44]  Trial Transcript, Nov. 7, 2023, at 140 (Nolan Test.).

[45]  App. to Answering Br. at B58–59.

[46]  *Id.* at B118.

[47]  Trial Transcript, Nov. 9, 2023, at 12–13 (Medina Test.).

[48]  Trial Transcript, Nov. 3, 2023, at 50–52 (Kilmon Test.), 81–83 (McCanney Test.), 116–17 (Draper Test.); Trial Transcript, Nov. 7, 2023, at 144 (Almansoori Test.), 160–61 (Wicks Test.).

[49]  App. to Answering Br. at B152–54.

[50]  *Id.* at B154.

from the register.[51]  Collins put the cash, including a wad of bills with a hidden GPS tracker, in the bag.[52]

(25)   The police tracked the GPS security pack to the 800 block of West 5[th] Street.[53]  An officer went behind the homes and saw someone by the fence of an adjoining yard.[54]  The officer pursued the person and found Gibson hiding behind a handicap ramp.[55]

(26)   The police also found a Rohm .357 revolver under the ramp that fit the holster that Gibson was wearing when he was arrested.[56]  One of the bullets in the chamber was a frangible bullet and another was coated with Nyclad.[57]  Gibson had another .38-caliber bullet and Copper Fit gloves in his pocket.[58]  The State argued that ballistics examination also linked the revolver to the June 5, 2021, robbery and murder of Christine Lugo at a Philadelphia Dunkin' Donuts.[59]

---

[51]  *Id.* at B156–58.

[52]  *Id.* at B157–59.

[53]  Trial Transcript, Nov. 3, 2023, at 15 (Wilkers Test.), 32–33 (Wood Test.), 43–46 (Kilmon Test.).

[54]  *Id.* at 45–46 (Kilmon Test.).

[55]  *Id.* at 50–54 (Kilmon Test.).

[56]  *Id.* at 84 (McCanney Test.), 111–12 (Draper Test.); Trial Transcript, Nov. 8, 2023, afternoon session, at 30–31(Wicks Test.).

[57]  App. to Answering Br. at B141–42.

[58]  Trial Transcript, Nov. 3, 2023, at 116–17 (Draper Test).

[59]  App. to Answering Br. at B190; *see also* October 2023 Order, 2022 WL 16642860, at *8 (stating that, "[t]he projectile recovered from the victim [Christine Lugo] is a ballistic match to the gun recovered during the Gibson's arrest.")).

## II.   CONTENTIONS ON APPEAL

(27)   On appeal Gibson raises the following five issues: (i) whether the trial court abused its discretion in denying Gibson's motion to sever the trial of the Ronald Wright murder counts from the Basilio and Almansoori counts; (ii) whether Gibson was denied the right to a fair trial due to an alleged error in failing to suppress evidence from his cellphone; (iii) whether Gibson was denied the right to a fair trial due to the alleged improper admission of prior bad act evidence under Delaware Rule of Evidence ("DRE") 404(b); (iv) whether the trial court erred in overruling Gibson's objection to admissibility of bicycle repair receipts; and (v) whether the trial court erred by permitting a witness to testify about what the slang term "lick" meant.

(28)   We affirm the Superior Court's judgment of conviction and find no error in the trial court's rulings addressing these issues.  We more fully explain our decision below as to each of the five issues raised on appeal.

## III.   ANALYSIS

### A. Whether the Superior Court Abused its Discretion in Denying the Motion to Sever.

(29)   Gibson asserts that the trial court committed reversible error in denying his motion to sever the Wright murder counts from the Basilio and Almansoori counts.

12

(30) The decision to grant or deny a motion for severance lies within the discretion of the trial court.[60] "As a general rule, the denial of a motion to sever results in an abuse of discretion when there is a reasonable probability that substantial prejudice may have resulted from a joint trial."[61] Further, the trial court's decision "will not be overturned by this Court in the absence of a showing of prejudice by the defendant."[62]

(31) As this Court explained in *Wiest v. State*:

> The prejudice which a defendant may suffer from a joinder of offenses has been described in the following terms: 1) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; 2) the jury may use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and 3) the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges.[63]

(32) "In determining whether the trial court has abused its discretion in denying a motion, we must examine the facts in each case."[64] We have done that here.

---

[60] *Caldwell v. State*, 780 A.2d 1037, 1055 (Del. 2001); *Bates v. State*, 386 A.2d 1139, 1141 (Del. 1978).

[61] *Wiest v. State*, 542 A.2d 1193, 1195 (Del. 1988) (citing *Bates*, 386 A.2d at 1141).

[62] *Id.* (citing *Lampkins v. State*, 465 A.2d 785, 794 (Del. 1983)); *see also Caldwell*, 780 A.2d at 1055 ("A new trial is warranted only if the defendant can show that there is a reasonable probability that a joint trial caused substantial prejudice to the defense.").

[63] *Wiest*, 542 A.2d at 1195 (citing *State v. McKay*, 382 A.2d 260, 262 (Del. Super. 1978)).

[64] *Id.*

(33)   Before trial, Gibson moved to sever the counts of his indictment for separate trials.   Gibson proposed that the charges be grouped as follows:   (1) "business robberies" (counts 1–8 (Basilio), 18–22 (Almansoori), and 30–41 (Collins)), further severing the PFBPP counts (counts 8, 22, 33, and 39–41) and trying them as part of a bifurcated trial with the "business robbery" counts;  (2) "drug dealer robbery" (counts 9–17 (Wright)), further severing and bifurcating for trial count 17 (PFBPP);  and (3) the "confrontation on the street" (counts 23–29 (Harris)), further severing and bifurcating for trial count 29 (PFBPP).[65]

(34)   Gibson argued below that he would suffer prejudice if severance were not granted because each offense could be proven without mentioning the others, but if they were tried together the jury could aggregate evidence and infer a general criminal disposition, ultimately finding him guilty on that basis.  Gibson also argued that the "sheer mass" of charges and the adverse publicity surrounding his case would taint the jury, and that the interests of judicial economy did not outweigh the prejudice.[66]  The State opposed the severance but requested simultaneous bench or bifurcated jury trials on the PFBPP charges if severance were granted.

(35)   In a thorough order dated November 2, 2022 (the "November 2022 Order"), the trial court granted severance but grouped the counts differently.  It

---

[65]   November 2022 Order, 2022 WL 16642860, at *1.

[66]   *Id.* at *2.

14

joined the Wright counts with the Basilio, Almansoori, and Collins counts. However, it severed the Harris counts and the drug-dealing counts.[67]

(36) Although the trial court largely granted his request, Gibson asserts on appeal that trying the Wright counts in the same trial as the Basilio and Almansoori counts denied him the right to a fair trial. According to Gibson, the jury, hearing the bad acts referenced in the Wright murder case, was unduly influenced by inadmissible evidence of prior bad acts when considering the evidence in the trial of the Basilio and Almansoori cases.[68] Accordingly, the substance of Gibson's argument is that if tried separately, evidence from the Wright case would not have been admissible in the Basilio and Almansoori trials.

(37) Below, the State argued that jury instructions would remedy any prejudice and that Gibson's offenses were of a similar character, similar *modus operandi*, demonstrated a common scheme, and that the evidence in some of the crimes was inextricably intertwined with the evidence in others. The State pointed to similarities in ballistics, the distinct *modus operandi* for shooting during the robberies, and video footage of Gibson wearing similar clothes across investigations, including wearing Wright's sling bag throughout the incidents. It also emphasized

---

[67] *Id.* at *3–4.

[68] Opening Br. at 19–20. Gibson does not challenge the initial joinder of the Wright case with the Basilio and Almansoori cases in the indictment. The State notes that the charges were not only from the same subchapters of the Delaware Code, but they were also largely from the same sections. Answering Br. at 17–18.

that all crimes occurred within 24 days and that a majority of the crimes occurred in "rapid-fire succession" and "within blocks of one another in the same area in Wilmington."[69]

(38) The trial court carefully considered the parties' arguments and properly considered our case law addressing prejudice in this context.[70]

(39) After reviewing the parties' submissions and case law, the trial court granted Gibson's motion to sever but adopted a different three-trial grouping of charges. Group I included robberies and threats of bodily harm/death (Basilio (counts 1-8), Wright (counts 9-17), Almansoori (counts 18-22), and Collins (counts 30-34)). Within Group I counts 8, 17, 22, and 33 (all PFBPP) were to be severed and tried as part of a bifurcated trial. Group II included the "confrontation on the street" (Harris (counts 23-29)). Count 29 (PFBPP) was severed and tried as part of a bifurcated trial. Finally, Group III consisted of the drug-related charges (counts 35-41). Counts 39, 40 and 41 (PABPP, PFDPP and PDWBPP, respectively) were severed and tried as part of a bifurcated trial.[71]

(40) The trial court explained why its Group I grouping would not confuse or overburden the jury, stating:

---

[69] November 2022 Order, 2022 WL 16642860, at *2.

[70] *Id.* at *2–3 (citing *Ashley v. State*, 85 A.3d 81, 84–85 (Del. 2014) (citing in turn *Wiest*, 542 A.2d at 1195)).

[71] *Id.* at *3.

In conformity with Rule 8(a), the above division groups offenses that are "of the same or similar character." The new division also addresses *McKay's* "sheer mass" concern by reducing the number of charges Gibson faces during any given trial. By far, the largest number of counts a jury will consider will be in the Group I trial. That trial will resolve a total of 27 charges. Severing the PFBPP charges and trying them in a bifurcated trial results in the jury being asked initially to consider 23 charges from four separate incidents. Simplifying the work of the jury is the fact that of those 23 charges, 10 of them are PFDCF charges paired with corresponding felony counts. Further simplifying the jury's task is the fact that each felony murder charge is paired with a robbery charge. When viewed in this fashion, the Court is confident that the jury will not be overburdened or confused by the "sheer mass" of charges, nor will Gibson be prejudiced by a joint trial of these counts.[72]

(41)  Next, the trial court explained why the robbery, the robbery-homicides, and the robbery-attempted homicide should be given their own trial:

These offenses are "of the same or similar character." The Court finds that the Wright counts should be tried along with the Basilio, Almansoori, and Collins robbery-homicide/attempted homicide counts. Distinguishing between legitimate and illegitimate money-making enterprises is an artificial distinction. Here, the State alleges Gibson, armed with a firearm, entered Metro PCS, a home, a deli, and a Rite Aid and harmed or threatened to harm people for the purpose of stealing the proceeds of a money[-]making enterprise. The common thread that ties the Basilio, Wright, Almansoori, and Collins incidents together is exactly that – Gibson's choice to rob money-making enterprises. The unifying thread is that these charges are of the "same or similar character" and are part of a common scheme or plan to acquire money, thus warranting a joint trial.[73]

---

[72]  *Id.* (referring to *State v. McKay*, 382 A.2d 260, 262 (Del. Super. 1978)).

[73]  *Id*. at *4 (internal citations omitted).

17

(42)    The trial court then explained that the "confrontation on the street" appeared to happen to Harris by happenstance as a result of an early morning chance encounter on the street. Accordingly, it found that "[t]he character of this set of offenses is fundamentality dissimilar to the 'business robberies' as well as any of Gibson's drug-related offenses."[74]

(43)    The trial court next explained that drug-related charges should be tried separately. Although Gibson was arrested allegedly wearing Wright's sling bag with drugs in it, the trial court did not find a logical nexus between those drug offenses and the alleged street-robbery, or the finance-focused "business robberies" that were accompanied by threats of bodily harm. As a result, the trial court deemed it "appropriate for these three categories of offenses to be tried separately."[75]

(44)    Finally, the trial court found that justice required the bifurcation of the PFBPP counts because the court did not believe that a jury could compartmentalize determinations of guilt. As the trial court explained:

> There is a serious risk that a jury, being advised that Gibson was prohibited from possessing a firearm by a virtue of a felony conviction, would infer a general criminal disposition, impairing his constitutional right to a fair trial. Therefore, bifurcation of the PFBPP charges is ordered. Bifurcation of the Possession of Ammunition by a Person Prohibited ("PABPP") and Possession of a Deadly Weapon by a Person

---

[74] *Id.*

[75] *Id.*

18

Prohibited ("PDWBPP") charges in the drug case is ordered as well for the same reasons.[76]

(45) "The joinder of charges under Superior Court Criminal Rule 8(a) is designed to promote judicial economy by permitting the State to try related charges together."[77] Pursuant to Superior Court Criminal Rule 14, the Superior Court has discretion to order separate trials "if it appears that the defendant is prejudiced by a joinder of offenses in an indictment."[78] As this Court said in *Jackson v. State*,[79] "[t]he rule of joinder is designed to promote judicial economy and efficiency, as long as the defendant's rights are not compromised."[80] In determining whether joinder is proper, "Superior Court Criminal Rules 8 and 14 must be read together."[81]

---

[76] *Id*. (internal citations omitted).

[77] *Caldwell*, 780 A.2d at 1054–55. Superior Court Criminal Rule 8(a) provides:

> (a) *Joinder of Offenses*. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Super. Ct. Crim. R. 8(a).

[78] *Wiest*, 542 A.2d at 1195. Superior Court Criminal Rule 14 provides, in relevant part:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Super. Ct. Crim. R. 14.

[79] 990 A.2d 1281 (Del. 2009).

[80] *Id*. at 1286.

[81] *Id*.

(46) On review, this Court engages in a two-part inquiry: first, whether charges were properly joined under Rule 8(a), and second, whether the Superior Court should have severed the offenses as prejudicial under Rule 14.[82] Here Gibson's challenge is centered only on the second part of that two-part inquiry.

(47) Gibson bore the burden of demonstrating prejudice from the denial of severance. The trial court carefully considered both the similarity of the charges and the potential for prejudice and found that Gibson would not be prejudiced by a joint trial with the counts severed as the trial court grouped them.[83] We agree. The Wright counts were connected with the Basilio and Almansoori counts temporally and logically. All involved Gibson, occurred in the Wilmington/Elsmere area within a three-week period, and involved a common *modus operandi* (the robbery of a money-making enterprise and shooting in the head with a revolver). Ballistics evidence also linked these crimes together. Accordingly, the trial court did not abuse its discretion by not severing the Wright counts from the Basilio and Almansoori counts.

(48) Further, evidence relating to the Wright murder would have been admissible under D.R.E. 404(b) in the other joined cases.

---

[82] *Id.*

[83] November 2022 Order, 2022 WL 16642860, at *3 ("When viewed in this fashion, the Court is confident that the jury will not be overburdened or confused by the 'sheer mass' of charges, nor will Gibson be prejudiced by a joint trial of these counts.").

20

(49)   As this Court stated in *Wiest*, "a crucial factor to be considered in making a final determination on a severance motion should be whether the evidence of one crime would be admissible in the trial of another crime."[84]  D.R.E. 404(b) governs the admission of evidence of other crimes, wrongs, or acts.[85]  Prior act evidence is not admissible to prove a person's character to show that the person acted in accordance with that character on a particular occasion.[86]  Prior act evidence may be admissible, however, for another proper purpose, such as proving motive, plan, or identity.[87]

(50)   When considering the admissibility of evidence offered under Rule 404(b), the trial court must consider the six factors set forth by this Court in *Getz v. State*:[88]

> (1)  The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case.  If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.
>
> (2)  The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent

---

[84]  *Wiest*, 542 A.2d at 1195 n.3 (citing *Bates*, 386 A.2d at 1142).

[85]  D.R.E. 404(b).

[86]  D.R.E. 404(b)(1) ("*Prohibited Uses.*  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

[87]  D.R.E. 404(b)(2) ("*Permitted Uses; Notice in a Criminal Case.*  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

[88]  538 A.2d 726 (Del. 1988).

with the basic prohibition against evidence of bad character or criminal disposition.

(3) The other crimes must be proved by evidence which is "plain, clear and conclusive."

(4) The other crimes must not be too remote in time from the charged offense.

(5) The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403.

(6) Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105.[89]

Gibson's argument raises only the first and fifth *Getz* factors.

(51) As to the first *Getz* factor, whether the evidence in the Wright case would be material to a disputed issue in the other joined cases, Gibson argues that evidence of the Wright murder was not material to whether Gibson was guilty of the Basilio murder or Almansoori attempted murder. We disagree. The identity of the shooter was a material fact in dispute in each case. As we explained above, these cases share a common *modus operandi* that links them together. Further, Wright and Almansoori were both shot with the same type of gun and very uncommon ammunition – frangible bullets. Because there was independent persuasive evidence in each case that Gibson was the shooter (including surveillance video identifications, Gibson's possession of items stolen from his victims, connections

---

[89] *Id.* at 734.

22

through ballistics evidence, etc.), any evidence linking the cases together made any evidence of Gibson's identity as the shooter in one case probative of his identity as the shooter in the other cases.

(52) As to the fifth *Getz* factor, whether the prejudicial effect of the other-crimes evidence substantially outweighs its probative value, Gibson makes only conclusory statements as to any prejudice incurred. He identifies both cumulation of evidence and the inference of criminal disposition as forms of potential prejudice and states baldly that such prejudice occurred in this case. He does not explain how this prejudice occurred or point to evidence that such prejudice did in fact occur.

(53) Although we acknowledge the "potential for prejudice inherent in a joint trial of separate offenses,"[90] we find no abuse of discretion in the trial court's denial of his motion for severance. Given the significant probative value of each case's evidence to the material issue of identity in each of the other cases and the minimal (if any) prejudice Gibson incurred, we are convinced that any prejudice incurred did not substantially outweigh the probative value of the other-crimes evidence.

(54) Moreover, the evidence in the Wright case would have been reciprocally admissible in the Basilio and Almansoori cases, which further supports

---

[90] *Skinner v. State*, 575 A.2d 1108, 1118 (Del. 1990).

23

our conclusion that the Superior Court did not abuse its discretion by not severing the Wright counts from the Basilio and Almansoori counts.[91]

### B. Whether the Superior Court Abused Its Discretion in Denying the Motion to Suppress Evidence Seized from Gibson's Phone.

(55) Gibson asserts that the trial court committed reversible error by failing to suppress evidence seized from his cell phone. He argues that the affidavit in support of the warrant to search his phone lacked sufficient particularity, that there was no logical nexus between the alleged crimes and his phone, and that certain evidence obtained from the phone was improperly admitted. The evidence that he claims was improperly admitted includes evidence showing that the phone had been turned off prior to, and shortly after, the Basilio murder. At oral argument before this Court, the parties were asked, but could not identify, any other evidence obtained from the warrant that was actually used at trial.[92] We find no merit to any of the assertions he raises on appeal.

---

[91] *See Caldwell*, 780 A.2d at 1056 n.62 (noting that, "[t]he State does not need to prove that the evidence would be admissible in both trials.") (citing *Skinner*, 575 A.2d at 1118 ("Although reciprocal admissibility is not a prerequisite for initial joinder, reciprocal admissibility is a pertinent factor for the trial court to consider.")).

[92] *See* Oral Argument at 15:40–16:05, 28:21–53 (Apr. 2, 2025), https://courts.delaware.gov/supreme/oralarguments. Our Court asked during Gibson's portion of the argument before our Court, "Did the State introduce anything from the cell phone other than the fact that it was powered off during the period of the May 15th robbery?" Gibson's counsel responded, "I could be wrong judge, and I'm sure I'll be corrected, but I believe that the only evidence that they came up with was that Mr. Gibson turned it off just before and then – well, the owner of that phone turned it off just before and then turned it off subsequent to." *Id.* at 15:40–16:05. Our Court then asked during the State's argument, "What was the sum total of the evidence used by the State that was derived from the warrant? Was it just the powering on and off of the phone?" The State responded, "I did my best to look through the record for any other indication.

(56)    When Gibson was arrested on June 8, 2021, shortly after the Rite Aid robbery, the Wilmington police seized a black Apple iPhone that was located on the right side of Gibson's belt.[93]  On November 8, 2021, Detective Scot Sowden of the Elsmere police and Detective Joseph Wicks of the Wilmington police obtained a warrant to search the iPhone.[94]

(57)    Gibson moved to suppress the evidence seized pursuant to that warrant.[95]  He argued that there was insufficient probable cause to establish a logical nexus between the alleged crimes and the iPhone, and that the warrant was a general warrant lacking particularity due to its unlimited scope and insufficiently limited search time frame.[96]

(58)    The State opposed the motion contending that the warrant was supported by probable cause establishing a nexus between the criminal activity and the iPhone.  The State also argued that the warrant was not a general warrant because

---

I couldn't find any, although only a subset of the transcripts were available from the Appellant and the opening brief, so I focused my argument on their argument."  *Id.* at 28:21–53.

[93]   *See* App. to Opening Br. at A6, at D.I. 32 (Motion to Suppress Evidence Seized from Defendant's iPhone, at 1–2 (May 3, 2022)) [hereinafter "May 2022 Motion to Suppress"].

[94]   When Gibson filed his May 2022 Motion to Suppress, he focused on a June 23, 2021, warrant (the "June Warrant").  However, on November 8, 2021, the police obtained a second warrant to search Gibson's cell phone (the "November Warrant").  *See* App. to Opening Br. at A278 (Search Warrant dated Nov. 8, 2021).  The Superior Court noted that "[t]his warrant 'was similar in substance to the first but refined its scope.'"  November 2022 Order, 2022 WL 16642860, at *6 (quoting the State's Response to the May 2022 Motion to Suppress).

[95]   May 2022 Motion to Suppress.

[96]   *Id.* at 6–9.

it properly limited the scope of the search to a specific time frame and to specific areas of the phone.

(59) The November Warrant authorized:

> A forensic examination for the digital contents of a black in color Apple iPhone with phone number [xxx-xxx-xxxx], that is currently in the custody of of [sic] the Wilmington Police Department, the digital contents of any attached storage device for the following dates: May 10, 2021 to June 8, 2021 (all dates are for 0001 hours EDT to 2359 hours EDT); specifically for call logs, GPS or other location-based data, SMS (text) messages and MMS (Multimedia) messages, internet & browser history, address book & contact list, images and/or videos, and information that may identify the owner of said phone, as that information is used or intended to be used for [various crimes including murder first degree, attempted murder first degree, and robbery first degree].[97]

(60) Gibson did not contest that the affidavit in support of the November Warrant listed facts sufficient to establish probable cause that Gibson committed a series of crimes beginning on May 15, 2021, and ending on June 8, 2021. Nor did he contest that the iPhone was his. Rather, he argued that the warrant was defective because the affidavit only stated why law enforcement believed that he carried the iPhone during the search dates, but not that it was used to commit the crimes.

---

[97] App. to Opening Br. at A278 (Search Warrant dated Nov. 8, 2021).

(61)    In a thorough order dated October 23, 2023 (the "October 2023 Order"), the Superior Court explained its conclusion that the affidavit established probable cause that a logical nexus existed between the iPhone and the specified crimes.[98]

(62)    The Superior Court's explanation was as follows:

> The warrant affidavit indicates that Gibson had a cell phone with a particular number, on or about the dates of the crimes. When Gibson was released from prison, he provided his iPhone number to probation and parole. This number links Gibson to the iPhone after his prison release date, April 27, 2021, and before the warrant's start date of May 10, 2021. Within hours of the Metro PCS robbery/murder, video surveillance captured images of a suspect matching Gibson's description exiting the victim's vehicle in Philadelphia while using a cell phone. A witness told Wilmington [p]olice that Gibson would often call the witness on the dates of the crimes. That witness showed the police the witness' phone showing a text message from Gibson 37 minutes before the Metro PCS robbery/murder, another text six minutes after a shooting at 322 W. 9th Street in Wilmington, a call eight minutes after that same incident, calls bracketing by several hours a homicide at 1200 W. 3rd Street, and texts less than an hour before the Rite Aid robbery. The affidavit seeks location information associated with these and possibly other communications which would be useful in identifying the location of the iPhone when the communications occurred. Finally, one of the 23 Metro PCS phones that were stolen was activated and included Gibson's phone number [in] it's [sic] contact list. The affidavit seeks information from the iPhone to "track individuals who Gibson was contacting in order to sell the phones."[99]

(63)    The Superior Court explained further that:

---

[98]  October 2023 Order, 2023 WL 7004105, at *3–4.

[99]  *Id.* at *3 (internal citations omitted).

27

It is clear that the affidavit establishes that Gibson possessed the iPhone at or near the times of the various crimes identified in the affidavit and communicated with at least one person in close temporal proximity to those crimes. The warrant authorizes a forensic examination of the iPhone for "GPS or other location-based data." Obviously, location data has significant evidentiary value. Further, information about other potential recipients of the stolen cell phones, including communications with such individuals, would have significant evidentiary value as well. It requires no leap of logic to conclude that if one recipient documented his association with Gibson in his cell phone, others might have done so too. It is also reasonable to conclude that Gibson, a person prohibited from possessing firearms or ammunition, used the iPhone to communicate with people illegally selling firearms. Such communications, which often include "photographs, videos, written descriptions, and price negotiations exchanged between buyer and seller" are consistent with the affiants' training and experience.[100]

(64)  In its October 2023 Order, the Superior Court also addressed Gibson's contention that the warrant was a general warrant lacking sufficient particularity. Gibson argued that the warrant permitted a "limitless[,]" "top-bottom[,]" "lifetime[,]" search of the iPhone, with "blanket authority[.]"[101]  Gibson argued that the June 23rd warrant lacked particularity because its language allowed for the search of "any and all attached storage devices" for "any and all information" that might identify a possible owner of said phones, and "any information related[,] used[,] or intended to be used for" Murder First Degree and Robbery First Degree.[102]

---

[100]  *Id*. at *4 (internal citations omitted).

[101]  May 2022 Motion to Suppress at 6–7.

[102]  *Id.* at 7; *see also* October 2023 Order, 2023 WL 7004105, at *4 (internal citations omitted).

However, the trial court observed that the language of the November Warrant was less broad than the June Warrant. It allowed for the search of the iPhone and "any attached storage device" but did not include the phrases "any and all," "any information," or "any and all information."[103]

(65) In addressing these contentions, the trial court carefully considered our opinions in, among others, *Thomas v. State*,[104] *Wheeler v. State*,[105] *Buckham v. State*,[106] and *Taylor v. State*.[107]

(66) The trial court noted that in *Wheeler*, *Buckham*, and *Taylor*, this Court invalidated warrants because investigators had a more precise description of the places to be searched than the description provided in the warrant.[108] In addition, nothing in the record in those cases supported an inference that evidence would have

---

[103] October 2023 Order, 2023 WL 7004105, at *4; *see also* App. to Opening Br. at A278 (Search Warrant dated Nov. 8, 2021).

[104] 305 A.3d 683 (Del. 2023).

[105] 135 A.3d 282 (Del. 2016). *Wheeler* was our Court's first opportunity to consider the United States Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), and the evolving jurisprudence in search warrants and electronic information.

[106] 185 A.3d 1 (Del. 2018).

[107] 260 A.3d 602 (Del. 2021).

[108] October 2023 Order, 2023 WL 7004105, at *4 (quoting *Thomas*, 305 A.3d at 702); *see also Wheeler*, 135 A.3d at 305 ("Where, as here, the investigators had available to them a more precise description of the alleged criminal activity that is the subject of the warrant, such information should be included in the instrument and the search and seizure should be appropriately narrowed to the relevant time period so as to mitigate the potential for an unconstitutional exploratory rummaging.").

been found in the less precise locations which the warrants authorized law enforcement to search.[109]

(67) However, here, the trial court determined that:

> In Gibson's case, there are no facts in the warrant affidavit to suggest that police had a more precise description of the places to be searched in the iPhone. The warrant authorizes a search of the iPhone for communications, location data, internet browsing history, images and videos, and iPhone ownership information. There are sufficient facts in the warrant affidavit to establish probable cause to believe that evidence might be found in each of those locations. The Court does not find that the warrant is broader than the probable cause that supports it.[110]

(68) Moreover, unlike *Wheeler*, *Buckham*, and *Taylor*, where there were no temporal limitations, here the November Warrant's time frame was limited to May 10, 2021, through June 8, 2021.[111]

(69) The trial court sufficiently explained why this time period was appropriately narrowed to a relevant time period. It stated:

> Gibson asserts that the search is a lifetime search, but this claim loses much of its force when the Court considers that the lifetime of the iPhone was only six weeks – from April 27th to June 8th and the crimes described in the affidavit began only 18 days into that lifetime and continued through the last day the police were authorized to search. Effectively, the crime spree encompassed nearly the lifetime of the iPhone. Even that brief timeframe is limited to a specified date range of only about four weeks,

---

[109] October 2023 Order, 2023 WL 7004105, at *4 (quoting *Thomas*, 305 A.3d at 702).

[110] *Id.* (internal citations omitted).

[111] *Id.* (internal citations omitted); *see also* App. to Opening Br. at A278 (Search Warrant dated Nov. 8, 2021).

beginning just five days before the first crime alleged. The warrant authorized a search of the iPhone beginning on May 10th. At most, Gibson can claim that the warrant was temporally overbroad by five days so that any information seized during the period from May 10[th] through the 14th would be subject to suppression. But, it is certainly reasonable to conclude that preparation for the first charged crime could have begun five days in advance of its commission. In any event, the Court is unaware that there was anything of evidentiary value seized during that period.[112]

(70) We affirm the trial court's decision to reject Gibson's challenges to the November Warrant. We agree that the November Warrant is not a general warrant and that it was not lacking in sufficient particularity.

(71) In denying Gibson's motion, the trial court noted that the November Warrant had eliminated much of the objectionable content from the earlier June Warrant, including the "any and all" language that Gibson had challenged in his Motion to Suppress.[113] Yet on appeal, as the State pointed out in its answering brief, Gibson "appears to base a substantial portion of his argument on the wrong search warrant."[114] Gibson did not file a reply brief and, therefore, he has not responded to

---

[112] *Id.* (internal citations omitted).

[113] *Id.* ("The language of the November 8th warrant is less broad than the June 23rd warrant. It allows for the search of the iPhone and "any attached storage device" but does not include the phrases "any and all," "any information[,]" or "any and all information."); *see also* App. to Opening Br. at A278 (Search Warrant dated Nov. 8, 2021).

[114] Answering Br. at 29 (listing examples beyond the absence of the "any and all" language noted by the trial court, including that Gibson "claims that the warrant sought information from April 27, 2021, to June 8, 2021—but that was the date range for the June warrant[,]" and that Gibson "contends that the warrant did not seek location data" when "the November warrant sought this type of evidence explicitly.").

the State's argument.[115] Neither did he offer a response to his erroneous reliance on the June Warrant when pressed about it at oral argument.[116] The police extracted evidence from the phone under the November Warrant, and the June Warrant is not relevant to this appeal.

(72) The November Warrant was sufficiently limited in scope and did not authorize a *Wheeler*-type of indiscriminate, top-to-bottom search of Gibson's phone. Its use of the word "any" is not problematic. For example, it sought permission to conduct a "forensic examination for the digital contents" of the phone and "any attached storage device."[117] This language did not create an undefined universe of places to be searched. Again, it was also cabined by the limited date range.

---

[115] We pause here to note a concerning trend in our Court involving litigants failing to file a reply brief. Although a reply brief is not required by our rules, reply briefs serve an important function in our adversarial system by allowing appellants to respond to opposing arguments. As the Seventh Circuit recently observed in *United States v. Clark*, 134 F.4th 480 (7th Cir. 2025):

> A reply brief is a party's opportunity to respond to material points pressed by an adversary and to put the reply within the framework (legal or factual) of the opening brief. To forgo a reply brief and remain silent to an adversary's most significant points is to leave a substantial opportunity on the cutting-room floor.

*Id.* at 482. In this case, Gibson's failure to file a reply brief left several significant arguments that the State advanced wholly unanswered. Gibson's counsel also chose to waive his rebuttal time at oral argument. *See* Oral Argument at 29:24–37 (Apr. 2, 2025), https://courts.delaware.gov/supreme/oralarguments.

[116] Oral Argument at 13:24–37 (Apr. 2, 2025), https://courts.delaware.gov/supreme/oralarguments. When asked by our Court about the opening brief referring to various categories of requested information that were present in the June Warrant but not the November Warrant, Gibson's counsel responded, "Correct, Your Honor, and I'm going to clarify that. There was some confusion on my part as to the warrants, which warrant had which information." *Id.* But Gibson's counsel offered no further explanation.

[117] App. to Opening Br. at A278 (Search Warrant dated Nov. 8, 2021).

(73) At oral argument, Gibson's counsel focused heavily on the five-day period (beginning May 10, 2021) before the Basilio murder and argued that the five days rendered the warrant unreasonable in scope. The trial court reasoned that the five-day period could have been used by Gibson for preparation to commit the crimes, and thus, the time period was reasonable. Even if the time period was a few days longer than it needed to be, any error was harmless because no evidence was admitted from that time period.

(74) Even if the November Warrant were overbroad as to the references to "internet & browser history" and "images and/or videos," as we said in *Taylor v. State*,[118] an overly broad warrant, unlike a general warrant, can be redacted to strike out those portions of the warrant that are invalid for lack of probable cause. By contrast, "[t]here is no room . . . for limited suppression of evidence seized under a general warrant."[119] Here, the warrant was not a general warrant, and none of the evidence derived from these categories was relied on at trial. In fact, the only evidence relied on at trial and derived from the November Warrant was the powering on and off of the phone around the time of the Basilio murder. Thus, even if the November Warrant were overbroad as to those other categories, the Superior Court

---

[118] 260 A.3d 602, 617 (discussing *United States v. Yusuf*, 461 F.3d 374, 393 n.19 (3d Cir. 2006)).

[119] *Id.*; *see also Thomas*, 305 A.3d at 702 (holding that "the trial court did not err when it deemed the Search Warrant to be overbroad rather than general," and that "[i]t appropriately redacted the evidence to eliminate the portions that are invalid for lack of probable cause.").

did not err in denying suppression of the evidence relating to the phone's status around the time of the murder.

### C. Whether It Was Error to Admit Prior Bad Act Evidence.

(75) Gibson argues that the trial court committed reversible error by admitting into evidence a video of the Dunkin' Donuts robbery-murder suspect grabbing and pushing the female victim into the store. He asserts that this evidence was inadmissible prior bad act evidence used to paint Gibson as a bad person who abused women. He argues that he was prejudiced and denied a fair trial as a result. We find no merit to this claim.

(76) Before trial, the State filed a sealed motion to admit evidence of the June 5, 2021, robbery and murder of Christine Lugo at a Dunkin' Donuts in Philadelphia.[120] The evidence included surveillance video of Gibson without a mask, grabbing Lugo by the shirt and pushing her into the Dunkin' Donuts before robbing the store and firing a single shot into Lugo's head, killing her.[121] The State sought to offer the evidence pursuant to D.R.E. 404(b) to prove Gibson's identity as Leslie Basilio's murderer.[122] The State argued that Gibson could not otherwise be

---

[120] October 2023 Order, 2023 WL 7004105, at *1, *1 n.3, *8. Because the motion was filed under seal, there is no docket number. *Id.* at *1 n.3.

[121] *Id.* at *8.

[122] *Id.* at *10–11. The trial court stated, "[i]n truth, the two incidents are nearly identical, save for the location and the fact that the suspect in the Metro PCS incident was masked and the suspect in the Dunkin' Donuts incident was not." *Id*. at *11.

adequately identified because he was wearing a mask during Basilio's murder and that commonalities between the two cases would assist in identifying Gibson.

(77) Gibson opposed the motion, arguing that the evidence did not tend to prove identity. After considering the factors set forth in *Getz* and *Deshields*, the trial court found that both the *Getz* and *Deshields* factors weighed in favor of including the evidence for identification purposes and granted the motion.[123] The trial court allowed the surveillance video to be played at trial but required the State to redact the actual shooting of Lugo from the video.

(78) Later, during trial, Gibson also objected more narrowly to the portion of the surveillance video that showed Gibson grabbing Lugo and pushing her into the store.[124] Gibson argued that in the Delaware robberies there was no altercation with the store clerks, it was not part of his *modus operandi* that could be used to identify him in those crimes, and it unnecessarily interjected an element of prejudice by depicting Gibson as a person who exhibited violence towards women.

(79) The trial court adopted its *Getz* analysis from the October 2023 Order and overruled the objection, finding that in this case where the jury would see several videos of shootings, the brief grabbing of Lugo's shirt and pushing her into the store was "incredibly de minimis" and would not increase one's view of Gibson "as a bad

---

[123] *Id.* at *12.

[124] App. to Answering Br. at B63–64, B79–81.

person by virtue of that."[125] Accordingly, the trial court earlier adhered to its analysis concluding that any prejudice did not substantially outweigh the probative value of the identification evidence.

(80) We review a trial court's decision to admit evidence under D.R.E. 404(b) for abuse of discretion.[126]

(81) As we explained above in Section III.A regarding severance of Gibson's charges for trial, D.R.E. 404(b) governs the admission of evidence of other crimes, wrongs, or acts. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[127] However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[128]

(82) When considering the admissibility of evidence offered under Rule 404(b), the trial court should apply the guidelines we set forth in the six *Getz* factors governing admissibility.[129] When considering the fifth *Getz* factor, whether the probative value of the evidence is substantially outweighed by its unfairly prejudicial

---

[125] *Id.* at 80–81.

[126] *Morse v. State*, 120 A.3d 1, 8 (Del. 2015) (citing *Watson v. State*, 2015 WL 1279958, at *2 (Del. Mar. 19, 2015)).

[127] D.R.E. 404(b)(1).

[128] D.R.E. 404(b)(2).

[129] *See Getz*, 538 A.2d at 734. *See also supra* note 88 and accompanying text listing the six factors.

effect, the trial court must consider the nine factors set forth by this Court in *Deshields v. State*:[130]

> (1) the extent to which the point to be proved is disputed; (2) the adequacy of proof of the prior conduct; (3) the probative force of the evidence; (4) the proponent's need for the evidence; (5) the availability of less prejudicial proof; (6) the inflammatory or prejudicial effect of the evidence; (7) the similarity of the prior wrong to the charged offense; (8) the effectiveness of limiting instructions; and (9) the extent to which prior act evidence would prolong the proceedings.[131]

(83)   As with his severance argument above, Gibson's argument on this issue also raises only the first and fifth *Getz* factors.[132]  Gibson argues that the evidence of Gibson grabbing and shoving Lugo was not material to an issue or ultimate fact in dispute in the case and that the probative value of the evidence did not outweigh its prejudicial effect.[133]

(84)   The trial court assessed the State's motion and Gibson's arguments at length under the *Getz* and *Deshields* factors in its October 2023 Order, the ruling on which the court relied at trial when overruling Gibson's objection.[134]  As to the first *Getz* factor, whether the other crime evidence is material to an issue or ultimate fact in dispute, the trial court determined that the identity of the perpetrator of the

---

[130]  706 A.2d 502 (Del. 1998).

[131]  *Id.* at 506.

[132]  Opening Br. at 40–41.

[133]  *Id.*

[134]  October 2023 Order, 2023 WL 7004105, at *11–12.

Delaware robberies was "vigorously disputed" and that the multiple surveillance videos "allow the viewer to compare, over an extended period of time, other characteristics of the men, including their mannerisms, gait, demeanor, and overall bearing. Those comparisons also support the conclusion that a single perpetrator committed both robbery/murders."[135]

(85) Assessing the fifth *Getz* factor, whether the probative value of the evidence was outweighed by any unfair prejudice, the trial court considered each of the *Deshields* factors:

> The Court concludes: (1) the identity of the suspect is wholly disputed; (2) clear video surveillance and reliable ballistics evidence are adequate means of proving the prior conduct; (3) the evidence is strongly probative of Gibson's identity, making it more probable that Gibson committed the charged crimes; (4) the State has a strong need for this evidence to connect Gibson to the charged crimes since the suspect's face is covered in the charged crimes and the ballistics evidence in the charged crimes is less probative than that in the proposed evidence; (5) neither party cites the availability of less prejudicial proof; (6) video evidence of the murder of Christine Lugo is inflammatory and difficult to watch, but its inflammatory character is mitigated somewhat by the fact that the jury will be exposed to videos of the other shootings of Leslie Basilio and Belal Almansoori and by the State's offer to redact the actual shooting of Christine Lugo from the video the jury watches; (7) the Dunkin' Donuts robbery/murder is similar in character to the charged crimes; (8) limiting instructions are likely to be effective because the proffered evidence is no more inflammatory, and possibly less inflammatory when redacted, than the charged crimes; and (9) the State believes that the introduction of the proffered evidence

---

[135] *Id.* at *11.

will take no more than one day, which will not unduly prolong what is estimated to be a four-week trial.[136]

(86) Finally, the trial court concluded in its bench ruling that its analysis above still applied and that any prejudicial effect from the grab-and-shove portion of the surveillance video was "incredibly de minimis" and would not increase the likelihood of the jury viewing Gibson as a bad person.[137] The trial court adopted its prior *Getz* and *Deshields* analysis and found "that that additional couple of seconds does not change anything from that analysis[.]"[138]

(87) The Superior Court did not abuse its discretion in allowing that portion of the video to be shown to the jury. The trial court appropriately and carefully considered the proffered evidence, the parties' arguments, and our case law before admitting the Dunkin' Donuts prior crime evidence with the shooting redacted. Considering the evidence offered at trial wholistically, we agree with the trial court that any prejudice resulting from this short portion of the Dunkin' Donuts surveillance video was extremely minimal when compared with the other evidence, including the videos of the Basilio and Almansoori shootings. Such minimal prejudice certainly did not outweigh the clear probative value as to the identity of the Basilio, Wright, and Almansoori shooter.

---

[136] *Id.* at *12.

[137] App. to Answering Br. at B80–81.

[138] *Id.* at B81.

(88) Finally, even if there were error, it was harmless. With such a overwhelming evidence against Gibson, it is unlikely that allowing the jury to see this short video of Gibson grabbing and pushing Lugo influenced the outcome of the case. Accordingly, Gibson's argument that he was denied a fair trial due to the admission of this evidence fails.

### D. Whether It Was Error to Admit the Bicycle Shop Receipts.

(89) Gibson argues that the trial court committed reversible error by admitting into evidence, over his objection, the receipt for the bicycle purchase and the subsequent bicycle repair. Gibson asserts that admitting the receipts under D.R.E. 803(15) was erroneous because D.R.E. 803(15) applies to dispositive documents, unlike the receipts.[139]

(90) The State argues in response that the receipts are admissible under D.R.E. 803(15). Additionally, the State argues that this Court need not analyze this issue because the trial court also admitted the evidence on the alternative grounds of D.R.E. 807, the residual exception to the hearsay rule.[140] The State contends that Gibson waived his argument because he did not challenge the admission of the evidence under D.R.E. 807 in his opening brief. We agree.

---

[139] D.R.E. 803(15) ("*Statements in Documents That Affect an Interest in Property.* A statement contained in a document that purports to establish or affect an interest in property if the matter stated was relevant to the document's purpose – unless later dealings with the property are inconsistent with the truth of the statement or the purport of the document.").

[140] App. to Opening Br. at A269–70.

(91) Supreme Court Rule 14(b)(vi)(A)(3) states: "The merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal."[141] Because Gibson failed to challenge the Superior Court's alternate grounds for admission of the bicycle receipt evidence under D.R.E 807 in his opening brief, his argument is waived. We find no reversible error in the trial court's admitting into evidence the bicycle receipts.

### E. Whether It Was Error to Admit Testimony that "Doing a Lick" Meant Robbery.

(92) Finally, Gibson argues that the trial court committed reversible error by permitting Amanda Masteller to testify that Gibson's statement to her that he lost his bicycle while committing a "lick" meant that he had committed a robbery. He claims that this evidence led the jury to believe that he had confessed to the Metro PCS store robbery and that as a result, he was denied a fair trial.

(93) Masteller testified that when Gibson first told her he did a "lick," she did not know what the term meant, but that she later learned it meant committing a robbery.[142] Gibson argues that this was error because Masteller's testimony on the meaning of the term "was based solely on hearsay evidence and did not contain any

---

[141] Del. Sup. Ct. R. 14(b)(vi)(A)(3).

[142] App. to Opening Br. at A275. In response to the State's question, "How do you now know what that means?," Masteller testified, "Because I'm on [sic] street smart now." *Id.*

foundation."[143]  He argued at trial that she could only have learned the meaning of the term "lick" from someone else which made her statement as to its meaning hearsay.[144]  On cross-examination, Masteller clarified that she learned the term's meaning from talking to "[p]robably like two or three friends that I asked."[145]

(94)  The trial court overruled Gibson's objection at trial, explaining that if she learned on the street the meaning of a term that she did not understand before, that was not hearsay but rather her educating herself.[146]

(95)  We see no abuse of discretion in the trial court's determination that Masteller's testimony was not hearsay.  She was testifying as to her understanding of a slang term within her own knowledge, not a particular statement made by a particular absent declarant.  The meaning of commonplace slang terms is within the range of perception and understanding of the average person, including the term "lick," which has been crowdsourced in Urban Dictionary and used in public media to mean "robbery."[147]  We note that this Court has previously acknowledged that the

---

[143]  Opening Br. at 48.

[144]  App. to Opening Br. at A274.

[145]  App. to Answering Br. at B121.

[146]  *Id.* at B116.  The trial court stated, "No, no, not hearsay.  If I read a book and I learn it, it is not hearsay.  If she understands what the term means now, that's not hearsay.  That's educating herself." *Id.*

[147]  *Freeman v. Maryland*, 318 A.3d 1241, 1252–53 (Md. 2024).

term "lick" means "robbery."[148]  And Gibson does not contest that "lick" means "robbery."

(96)   Even if allowing Masteller to testify as to the meaning of the term "lick" were error, it was harmless error.  The overwhelming weight of evidence against Gibson, including multiple identifications of him in surveillance footage committing the crimes, makes it extremely unlikely that the jury would have acquitted Gibson if not for Masteller's testimony as to the meaning of the term "lick."

(97)   Accordingly, Gibson's final issue on appeal lacks merit.

## IV.   CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of conviction.


BY THE COURT:

/s/ Karen L. Valihura
Justice

---

[148]  *See Ray v. State*, 280 A.3d 627, 631 (Del. 2022).